[No. 3545-0-III. Division Three. July 31, 1980.]

JAMES DAVID BICH, *Respondent,* v. GENERAL ELECTRIC COMPANY, *Appellant.*

26

*Craig P. Campbell, David Swartling,* and *Karr, Tuttle, Koch, Campbell, Mawer & Morrow,* for appellant.

*J. K. Bromiley* and *Whitmore, Warren & Bromiley,* for respondent.

MUNSON, J.—Defendant, General Electric Company, appeals a verdict in favor of plaintiff, James Bich, for personal injuries. Bich was injured in an explosion while changing a fuse to a potential transformer manufactured by General Electric (GE). Bich sued on the theory of strict liability. We affirm.

On May 10, 1974, James Bich, an electrician at Wells Dam, was notified that a metering device on one of the dam's transformers indicated a malfunction. Bich discovered that a fuse had blown in a GE "potential transformer"[1] (hereinafter referred to as "transformer"). Five of the 15 transformers at Wells Dam were manufactured by GE, the remainder by Westinghouse. The GE transformer Bich checked was housed in a metal cubicle located approximately 14 feet off the plant floor. The cubicle works like a drawer with the transformer and its fuses housed within the metal cabinet. When the drawer is

---

[1] A potential transformer may be simplistically defined as a component of the electrical system designed to reduce the main load of 14,400 volts to 120 volts, thus allowing synchronization of the various electrical generators with the rest of the electrical system. We use the term "potential transformer" because that is the term used by the parties.

opened, the circuit automatically breaks; when the drawer is closed, the circuit is complete.

Bich replaced the GE fuses with Westinghouse fuses. Both the GE and Westinghouse fuses were labeled 14,400 volts and .5E; they were the same length, 11 1/2 inches. Although the Westinghouse fuses were slightly larger in diameter, they fit readily into the clips designed to hold the GE fuses. Bich closed the drawer and waited approximately 30 to 60 seconds to see if the new fuses would hold. As he reopened the drawer, electric current arced from the opening followed immediately by an explosion and fire. Although the Westinghouse and GE fuses were similar in appearance and labeling, the Westinghouse fuses had a longer time–delay curve than the GE fuses. Bich was severely burned in the explosion.

■ Strict liability in tort is based upon Restatement (Second) of Torts § 402A (1965)[2] and was adopted in Washington in *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969). In order to prove strict liability, a plaintiff must establish (1) a defect, either in design or in manufacturing, (2) which existed at the time the product left the hands of the manufacturer, (3) and not contemplated by the user, (4) which renders the product unreasonably dangerous or not reasonably safe, and (5) which was the proximate cause of plaintiff's injury. *Lamon v. McDonnell Douglas Corp.,* 19 Wn. App. 515, 521, 576 P.2d 426 (1978), *aff'd,* 91 Wn.2d 345, 588 P.2d 1346 (1979); *Potter v. Van*

---

[2]Restatement (Second) of Torts § 402A (1965):

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*Waters & Rogers, Inc.,* 19 Wn. App. 746, 578 P.2d 859 (1978).

GE first contends strict liability was inapplicable because Bich was not a user or consumer contemplated by section 402A. We find no merit to this contention. The benefits of strict liability extend to all whom a manufacturer should reasonably expect to use its product, which includes employees and repairmen. *Jackson v. Standard Oil Co.,* 8 Wn. App. 83, 505 P.2d 139 (1972); *See Seay v. Chrysler Corp.,* 93 Wn.2d 319, 609 P.2d 1382 (1980). Restatement (Second) of Torts § 402A, comment *l*, at 354 (1965), defines a "user" as one who uses a product "for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs . . ." Bich fits squarely within this definition; he was an employee of Wells Dam, whose job was to maintain and repair this equipment.

GE next asserts that the transformers were not "products" because they were sold as part of a 1–time negotiated transaction, built to the buyer's specifications, were component parts of a larger electric power generator system and were not placed in the stream of commerce. The record establishes that GE had manufactured 30,000 similar transformers over a period of 30 years; they were shipped and installed as self–contained units. The transformers were "products" within the scope of section 402A.

A user or consumer may be barred from recovery if the product underwent substantial change in its condition after leaving the manufacturer. Restatement (Second) of Torts § 402A(1)(b), comment *p,* at 357 (1965). GE argues that Bich's substitution of Westinghouse fuses for GE fuses constituted such a substantial change. It was GE's theory that but for the substitution of fuses, the accident would not have occurred. Whether the substitution was a substantial change is a question of fact. The parties introduced conflicting evidence on this point. Employees at the dam testified it was acceptable practice to interchange GE and Westinghouse fuses. GE's experts testified that such a

practice was unacceptable. The jury was given three instructions relating to the issue of substitution: two instructed the jury a manufacturer is not liable if the product is mishandled in a manner unforeseeable to the manufacturer; another instructed that a seller is not liable if the product is delivered in a safe condition but undergoes subsequent changes not reasonably foreseeable by the manufacturer. Whether the substitution of fuses was a substantial change for which GE would not be held strictly liable was a question for the jury and was properly submitted for their determination.

GE next contends the evidence failed to establish a design or manufacturing defect. We disagree. Bich's witnesses testified that in their opinion, the accident occurred as a result of "turn–to–turn shorts" in the primary windings of the transformer. Ronald Seaman, electrical engineer at the dam, said that in his opinion the current in the transformer just prior to the accident was "snowballing" as the result of a breakdown in the process. Martin Erkela, a hydroelectrician and Bich's supervisor, believed the original GE fuses blew as a result of "over current" caused by short circuits in either the primary or secondary system of the transformer. Charles Titus, a GE consulting engineer, also testified to the possibility of "turn–to–turn failure" due to equipment having been exposed to the weather prior to installation. On rebuttal, however, Bich testified that the equipment had been stored in large steel warehouses after its arrival at the dam and had not been subject to exposure. GE seems to concede the transformer was failing, yet GE's brief argues that, "By itself, this failure cannot be equated to a defect. When an electrical device wears out it is not defective in a products liability sense." However, GE's consulting engineer testified that the life expectancy of a transformer was "Thirty, forty years."

Because much of the equipment had been destroyed in the explosion, the evidence pointing to a defect was by necessity circumstantial. GE argues that because of the nature and complexity of the transformer, direct evidence

was required to prove a defect. The mere fact of an accident alone does not establish that a product was defective; but "[c]ircumstantial evidence may be used to prove that a product was defective when it left the manufacturer." *Pearson Constr. Corp. v. Intertherm, Inc.,* 18 Wn. App. 17, 18, 566 P.2d 575 (1977); *Bombardi v. Pochel's Appliance & TV Co.,* 10 Wn. App. 243, 246, 518 P.2d 202 (1973). To require direct evidence of a defect because of the nature and complexity of a product would defeat a majority of products liability claims. GE cites no authority for such a requirement. A "product is defective if it fails to perform reasonably, adequately and safely the normal, anticipated or specified use to which the manufacturer intends that it be put, and it is unreasonably dangerous to the plaintiff." *Bombardi v. Pochel's Appliance & TV Co., supra* at 245. Given the severity of the explosion in conjunction with the failure of the original fuses and testimony that the transformer was failing 5 years after its installation, we find there was sufficient evidence, albeit circumstantial, from which a jury could reasonably infer that such a failure was a manufacturing defect.

GE introduced considerable testimony on the differences in the time–delay characteristics of the GE and Westinghouse fuses. GE asserts that because the Westinghouse fuses had a longer time–delay curve, the fuses had not cleared by the time the drawer was reopened causing the arc and subsequent explosion. The GE fuses, however, with their shorter time delay, would have cleared and the explosion would not have occurred. Bich and Erkela estimated Bich waited 30 to 60 seconds before he opened the drawer after he had put in the Westinghouse fuses. Bich believed both the GE and Westinghouse fuses were nondelaying fuses which would have blown instantaneously. Erkela believed since both GE and Westinghouse fuses had the same ratings and similar dimensions, they were interchangeable.

██ Bich's alternative theory of the case was that GE's transformer was unreasonably dangerous due to GE's

failure to adequately warn of fuse substitution. A manufacturer may be held strictly liable even though his product was faultlessly manufactured if the product is unreasonably dangerous because the manufacturer failed to give adequate warnings. *Little v. PPG Indus., Inc.,* 92 Wn.2d 118, 594 P.2d 911 (1979); *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 587 P.2d 160 (1978); *Haysom v. Coleman Lantern Co.,* 89 Wn.2d 474, 573 P.2d 785 (1978); *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 570 P.2d 438 (1977); *Berry v. Coleman Sys. Co.,* 23 Wn. App. 622, 596 P.2d 1365 (1979); *Kimble v. Waste Sys. Int'l, Inc.,* 23 Wn. App. 331, 595 P.2d 569 (1979); *Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 550 P.2d 71 (1976). The touchstone in determining whether a product is unreasonably dangerous is what the reasonable expectations are of the user or consumer. A product is not reasonably safe if it would be "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 154, 542 P.2d 774 (1975); *Estate of Ryder v. Kelly–Springfield Tire Co., supra.*

> In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

*Seattle–First Nat'l Bank v. Tabert, supra* at 154.

Evidence at trial established that the GE and Westinghouse fuses were similar in appearance and in labeling; however, the Westinghouse fuses which Bich substituted for GE's fuses were manufactured approximately 3 years after the GE transformers were installed. GE argues that it could not foresee that a similar fuse manufactured by another manufacturer 3 years later might have different delay characteristics for which it should have warned its

users. However, GE's own expert testified that both GE and Westinghouse manufactured time–delay fuses as far back as 1967. Although time–delay charts were prepared long before this explosion, GE did not furnish them to the dam until after the accident. Yet evidence indicated all such high voltage equipment requires time–delay fuses. We agree that GE had no duty to warn in 1969 of a fuse Westinghouse manufactured in 1973; however, the jury could have found GE did have a duty to warn of the time–delay characteristics of its own fuses. "[T]he adequacy of both the content and prominence of warnings accompanying a product is a question for the jury, and the court need not furnish guidelines to aid the jury in its determination." *Berry v. Coleman Sys. Co., supra* at 627. GE graphically illustrated, through testimony of its witnesses, the potential harm of substituting one manufacturer's fuse with different time–delay characteristics. It would have been a simple and inexpensive matter for GE to have included on its fuses a warning not to substitute fuses or to have given information regarding the time–delay characteristics of its fuses. We cannot say as a matter of law that the dangers here were so obvious or known that no warning was required. *Kimble v. Waste Sys. Int'l, Inc., supra.* Whether the transformer was unreasonably dangerous because of GE's inadequate warnings was a question for the jury. In fact, GE's counsel at the close of trial contended that the duty to warn was the only issue which should go to the jury. We find no error in submitting the duty to warn issue to the jury.

GE invites this court to extend comparative negligence to apply to strict liability. Since this case was heard, our Supreme Court has held that comparative negligence applies only to actions based on negligence and does not apply to causes of action for strict liability. *Seay v. Chrysler Corp., supra.* This issue is now settled contrary to GE's contention.

GE next asserts the trial court erred in not granting a mistrial because Bich's counsel deliberately introduced

the issue of attorney's fees as a matter to be considered by the jury. The remarks of Bich's counsel on closing argument are not a part of the record before us. Therefore, the record is inadequate to review the merits of this assignment of error. *Reed v. Pennwalt Corp.,* 93 Wn.2d 5, 604 P.2d 164 (1979).

■ At trial, GE requested admission of an experiment which it claimed would demonstrate the different delay characteristics of the Westinghouse and General Electric fuses. The trial court refused to admit the demonstration. "The ultimate test for the admissibility of an experiment as evidence is whether it tends to enlighten the jury and to enable them more intelligently to consider the issues presented." *Sewell v. MacRae,* 52 Wn.2d 103, 107, 323 P.2d 236 (1958). Bich's counsel objected to the demonstration because a number of factors were different from those which existed at the dam at the time of the accident. The experiment was to be conducted at 1.3 amps. No one knew what the amperage was at the time of the accident. The voltage at the dam was 14.4kv; the voltage for the experiment was 12kv. The magnetic field which existed at the dam could not be recreated in the courtroom. All of the conditions of an experiment must be substantially similar and also more satisfactory or reliable than oral testimony. *Sewell v. MacRae, supra* at 107. Here, GE's experts testified at length as to the time–delay characteristics of the two fuses. A trial court is given wide discretion in determining the admissibility of evidence as to tests and experiments and will be reversed only for an abuse of discretion. *Bichl v. Poinier,* 71 Wn.2d 492, 429 P.2d 228 (1967). We find no abuse of discretion.

GE next contends the trial court erred in admitting certain speculative opinion testimony of Martin Erkela, Bich's supervisor and a hydroelectrician at the dam. The testimony to which GE objects as prejudicial and reversible error is Erkela's answer to a question regarding the interchanging of GE with Westinghouse fuses.

Q As far as any training you had had in that area, were there any warnings of any kind which would have caused you to be hesitant about opening the cubicle?
A No, because it has been standard procedure in the industry, *as far as I know* on this river even, it has always been satisfactory to do it this way.

(Italics ours.) GE argues that Erkela did not have knowledge of the practice at other dams and was therefore unqualified to testify. GE, however, makes no objection to an answer by Erkela to a question by GE's counsel in the deposition published at trial:

Q Do you know of any other dams on the river that interchange fuses?
A I can't say for sure.

■ Erkela's testimony indicates that he was not certain but, as far as he knew, other dams on the river also interchanged fuses. Erkela had worked at the dam since 1967 and had testified as to his knowledge of the workings of the dam including the transformers. He was competent as an expert to testify. *Potter v. Van Waters & Rogers, Inc.,* 19 Wn. App. 746, 578 P.2d 859 (1978); *Levea v. G.A. Gray Corp.,* 17 Wn. App. 214, 562 P.2d 1276 (1977). Seaman, the dam's electrical engineer, testified it was acceptable practice to interchange fuses at the dam. GE introduced an expert who testified it was not prudent practice to substitute Westinghouse for GE fuses. Any deficiency in Erkela's qualifications or testimony as to other practices on the river went to the weight of his testimony rather than to its admissibility.

[T]he admission or exclusion of opinion evidence is within the sound discretion of the trial court. . . . If the reasons for admitting or excluding the opinion evidence are both fairly debatable, the trial court's exercise of discretion will not be reversed on appeal.

(Citations omitted.) *Levea v. G.A. Gray Corp., supra* at 220–21. We find no abuse of discretion.

■ Finally, GE assigns error to 15 instructions given by the trial court to the jury. GE failed to except to 9 of those instructions; thus they will not be reviewed on appeal. *Reed*

*v. Pennwalt Corp., supra; Cantu v. John Deere Co.,* 24 Wn. App. 701, 603 P.2d 839 (1979).

We decide the remaining instructions summarily. GE assigns error to instruction No. 2 which merely sets forth the allegations of plaintiff's case and defendant's affirmative defenses. Instruction No. 3, however, stated that the preceding instructions were merely a summary of the claims of the parties and not the law of the case. GE excepted to instruction No. 10 on the basis of insufficient evidence. That instruction correctly defined the term "defect." As discussed earlier, the evidence was sufficient to submit the matter to the jury. GE excepted to instruction No. 11, alleging it omitted an element of Restatement (Second) of Torts § 402A (1965). Our review reveals no omission; the instruction is substantially similar to section 402A with no change in meaning. GE objects to instruction No. 13 because it eliminated the affirmative defense of comparative fault; that is not the law in Washington in relation to strict liability. *Seay v. Chrysler Corp.,* 93 Wn.2d 319, 609 P.2d 1382 (1980). In instruction No. 18, GE excepted for an entirely different reason than is set forth in its brief. We find no error in the instruction. Finally, as to instruction No. 22, we find no real exception which would apprise the trial court of error. The instruction sets forth plaintiff's theory of the case.

The errors assigned by GE were primarily issues of fact which were properly before the jury and decided in Bich's favor. GE had ample opportunity to present its theories of the case. The evidence was sufficient to sustain the jury's verdict that GE was strictly liable either for a defect in manufacture or for failure adequately to warn. We find no reason to upset that verdict on appeal.

Judgment affirmed.

McINTURFF, A.C.J., and ROE, J., concur.

Reconsideration denied September 23, 1980.