[No. 9382–7–I. Division One. August 2, 1982.]

ELMER J. TURNGREN, ET AL, *Appellants,* v. KING COUNTY, ET AL, *Respondents.*

*Michael Withey,* for appellants.

*Norm Maleng, Prosecuting Attorney, Patrick Schneider* and *Michael Duggan, Deputies, Waitt, Johnson & Martens,* and *Barry Johnson,* for respondents.

ANDERSEN, C.J.—

FACTS OF CASE

The plaintiffs, five members of the Elmer Turngren family, appeal the entry of summary judgments of dismissal of the defendants King County, King County Department of Public Safety, the City of Redmond and the City of Redmond Police Department.[1] We affirm.

This action for damages based on claims of tort and violation of civil rights arose out of the service of a search warrant at the Elmer Turngren residence on October 27, 1978 by officers of the King County Department of Public Safety and of other local and federal law enforcement agencies.

On or about October 25, 1978, an individual presented a .38 caliber pistol to a Redmond Police Department detec-

---

[1]The individual officers herein involved were dismissed as defendants by stipulation of all parties in the Superior Court.

tive and inquired as to whether or not it was stolen. The individual indicated that he had acquired the pistol from another person who was known to the detective as an informant. This informant, on several past occasions, had supplied the detective with reliable information on a completely voluntary basis and without receiving any type of compensation for it. The detective checked out the pistol and ascertained that it had been stolen from a King County residence. The detective then contacted the informant who voluntarily agreed to a meeting to discuss what information he had concerning the pistol.

The Redmond detective thereupon contacted a detective in the King County Department of Public Safety. That detective then also questioned the informant and ascertained from the informant that he had personally observed automatic weapons, hand grenades, a pipe bomb and drugs at a King County residence, later identified as the Elmer Turngren residence. The informant related that the arsenal belonged to a person named "Keith" (Elmer Keith Turngren) who was then living at the Turngren home, that Keith had told him he was a "warlord" for the Hell's Angels motorcycle gang and that the weapons were going to be sold in the near future. Over the course of 2 days, the informant was questioned by at least three other law enforcement officers. During this time, the King County detective also tried to gather some background information on "Keith" but for the most part was unsuccessful.

The informant was then taken to the King County Prosecuting Attorney's Office where he was questioned for approximately an hour by a deputy prosecuting attorney. This questioning was with regard to both the substance of the informant's report and his past reliability and association with the Redmond detective. The deputy prosecuting attorney concluded that probable cause for a search existed and prepared an affidavit for a search warrant. The affidavit which described the informant's past reliability and detailed his recent observations at the Turngren home was duly sworn to by the two detectives and issuance of the

warrant was approved in writing by the deputy prosecuting attorney.

The Redmond and King County Police detectives, along with the informant, then appeared before a district justice court judge on October 27, 1978. The judge placed them all under oath and questioned them further concerning the contents of the affidavit. The court found that probable cause for the issuance of the warrant existed and issued a search warrant for the Turngren home.

Due to extensive preparations to cordon off the Turngren neighborhood and otherwise insure the safety of the neighborhood residents, the search warrant was served later that day at approximately 10:30 p.m. Three members of the Turngren family were home at the time but no contraband of any kind was found and no criminal proceedings were ever instituted as a result of the search. At the time of the search, Keith had moved out. The King County detective said that he found that the closet in the bedroom where the informant had reported the weapons to be had been cleaned out.

In response to media requests, the King County Department of Public Safety issued a statement describing service of the warrant and its negative results. The written release stated:

> On Oct. 27, 1978, at approx. 10:30 p.m., King County police served a search warrant for weapons at a home in the city of Kirkland. In preparation for the worst and concern for the safety of citizens in the area, it was cordoned off. The search warrant was served with negative results.

Oral statements in a similar vein were also made in response to media questions.

In May 1979, the Turngrens brought this lawsuit. They ask damages based on a claim that the affidavit in support of the search warrant contained various intentional or reckless misrepresentations. The Turngrens also seek damages for allegedly defamatory statements made to the

media by the police subsequent to the search. After approximately a year of pretrial discovery, the Superior Court entered orders on September 23, 1980 and September 30, 1980 granting summary judgments dismissing the action. The Superior Court judge who heard the motions for summary judgment also denied the Turngrens' motion to vacate the summary judgment orders and to disqualify himself.

The Turngrens' appeal presents four basic issues.

## ISSUES

ISSUE ONE. Was summary judgment proper as to the common law tort claims?

ISSUE TWO. Was summary judgment proper as to the violation of civil rights claim brought pursuant to 42 U.S.C. § 1983?

ISSUE THREE. Was summary judgment proper as to the defamation claim?

ISSUE FOUR. Did the trial judge err by denying the Turngrens' motion to vacate the summary judgment orders and disqualify himself as judge?

## DECISION

ISSUE ONE.

CONCLUSION. Because the record does not raise a reasonable inference of malicious or reckless conduct on the part of the detectives in this case, summary judgment on the common law tort claims was proper.

 In an action such as this one, the Turngrens, as plaintiffs, must show that the detectives maliciously or recklessly misrepresented material facts in the affidavit which resulted in the issuance of a warrant authorizing the search of their home. *Ladd v. Miles,* 171 Wash. 44, 17 P.2d 875 (1932); *Clipse v. Gillis,* 20 Wn. App. 691, 696, 582 P.2d 555 (1978). *See* 1 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 22.3(c), at 22–22 (2d ed. 1981). Mere negligence in the criminal investigation will not suffice. *Clipse v. Gillis, supra* at 694–96.

While it has been said that the abandonment of prosecu-

tion is prima facie proof of lack of probable cause which in turn permits an inference of malice, *see Pallett v. Thompkins,* 10 Wn.2d 697, 699, 118 P.2d 190 (1941), "[h]owever, we have also said that such evidence of want of probable cause does not *necessarily* make a *prima facie* showing of the additional and essential element of malice", *Barker v. Waltz,* 40 Wn.2d 866, 870, 246 P.2d 846 (1952). Where there has been no affirmative showing of acts disclosing the least feeling of bitterness, animosity or vindictiveness, an inference of malice is not justified.[2] *Barker v. Waltz, supra* at 870, quoting *Ton v. Stetson,* 43 Wash. 471, 475, 86 P. 668 (1906).

 Our review of the record in this case[3] demonstrates

---

[2]Where, as here, a search warrant is valid on its face, and thus apparently supported by ample probable cause, the mere fact that the evidence sought was not found and the suspect not prosecuted does not, in and of itself, establish prima facie proof of lack of probable cause. *See State v. Goodlow,* 11 Wn. App. 533, 535–36, 523 P.2d 1204, *review denied,* 84 Wn.2d 1012 (1974). In such a situation, the Turngrens must go behind the warrant and make an initial showing of a misrepresentation of a material fact by the detectives or an intentional misrepresentation of any fact before an inference of lack of probable cause may arise. *State v. Goodlow, supra; State v. Larson,* 26 Wn. App. 564, 568–69, 613 P.2d 542 (1980). "The Fourth Amendment does not proscribe 'inaccurate' searches only 'unreasonable' ones." *State v. Seagull,* 95 Wn.2d 898, 908, 632 P.2d 44 (1981).

Moreover, even if we assume arguendo that the abandonment of the criminal investigation in this case establishes prima facie proof of lack of probable cause, an inference of malice therefrom is not justified because the record does not disclose any facts showing the least feeling of bitterness, animosity or vindictiveness on the part of the detectives toward the Turngrens. *Barker v. Waltz, supra* at 870, quoting *Ton v. Stetson,* 43 Wash. 471, 475, 86 P. 668 (1906).

[3]The unsworn and unsigned statement of the informant reported by counsel for the Turngrens is hearsay, admissible only to impeach the credibility of the informant's deposition testimony and, as such, cannot create an issue of material fact. *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 643–44, 618 P.2d 96 (1980). Further, the unsworn "affidavit" of the Turngrens' expert witness, Robert di Grazia, fails to raise any genuine issue of material fact concerning the detectives' malicious or reckless conduct since it is based on conclusory allegations without the required detailing of the specific facts underlying his opinion. CR 56(e). *See Peterick v. State,* 22 Wn. App. 163, 181, 589 P.2d 250 (1977). Moreover, even if the expert's conclusory allegations are taken as true, the "affidavit" raises no more than an inference of negligent investigation and that is not sufficient to preclude summary judgment in a case of this kind. *See Clipse v. Gillis, supra* at 694–96.

an absence of any issue of material fact in regard to the detectives' allegedly malicious or reckless conduct.[4] To the contrary, the record shows that the detectives, the deputy prosecuting attorney and the district court judge went to extraordinary lengths, particularly in light of the obvious need for prompt action, to verify the informant's information. Further, there is no affirmative showing of specific facts by the Turngrens, as there must be, that the representations to the district court judge concerning the informant's past reliability were made by the detectives with malicious intent or reckless disregard of the truth. In addition, the fact that counsel for the Turngrens chose to question the Redmond detective on some but not all of some ten instances evincing the informant's past reliability, cannot create an inference that the Redmond detective intentionally overstated the informant's reliability to the district court judge. Conclusory allegations, speculative statements or argumentative assertions that unresolved factual matters remain are not sufficient to preclude an order of summary judgment. *Peterick v. State,* 22 Wn. App. 163, 181, 589 P.2d 250 (1977); *Dwinell's Cent. Neon v. Cosmopolitan Chinook Hotel,* 21 Wn. App. 929, 933, 587 P.2d 191 (1978).

---

[4]The Turngrens' reliance on an agency theory as a means of vicariously imputing liability to the police for the wrongful actions of its unpaid voluntary informants is misplaced. The police are not, as a practical matter, the insurers of the veracity of their informants' information. Absent intentionally malicious conduct or reckless conduct *on the part of law enforcement officers,* an action for damages cannot be sustained. *See Ladd v. Miles, supra; Clipse v. Gillis, supra* at 696.

As the United States Supreme Court has observed in an analogous situation, there exists

a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination.

. . .

. . . Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, *not of any nongovernmental informant.*

(Italics ours.) *Franks v. Delaware,* 438 U.S. 154, 170-71, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978).

ISSUE TWO.

CONCLUSION. Because the record does not raise an inference that the allegedly wrongful actions of the individual detectives were made pursuant to a governmental policy or custom, the trial court did not err in granting summary judgment on the breach of civil rights claim against King County, the City of Redmond and the respective police departments of these two municipal bodies.

██ 42 U.S.C. § 1983, under which this claim was brought, provides in its pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).

The record in this case raises no reasonable inference that the allegedly wrongful actions of the individual detectives were done pursuant to an official policy or custom. Instead, the official policies and customs, as evidenced by the King County Department of Public Safety Training Bulletin 1.7, and the detectives' actions in going to the deputy prosecuting attorney prior to applying for the warrant and the meeting of senior law enforcement officers prior to the warrant's execution, were to insure that the search warrant was obtained and executed in a lawful and safe manner.

ISSUE THREE.

■ CONCLUSION. Where, as here, there is no reasonable inference of perjury or malice, and the release of information about a criminal investigation by police officers or agencies is in response to the public's right to know, such release is a discretionary act concerning which the police officers and agencies are immune from liability. Summary judgment on the defamation claim was therefore appropriate.

The Turngrens ask damages on the basis of their claim that various statements by the police to the press were defamatory. As previously observed, however, the record does not raise a reasonable inference of malicious or reckless conduct on the part of the police at any stage of their investigation. Whether or not information provided to the press later proves inaccurate in some particulars, a county, city and their employees are immune from tort liability for their disclosures made concerning this criminal investigation. *Moloney v. Tribune Pub'g Co.,* 26 Wn. App. 357, 360, 613 P.2d 1179 (1980).

ISSUE FOUR.

CONCLUSION. The Superior Court judge who heard the motions for summary judgment did not err in denying the Turngrens' motion asking that he disqualify himself since no bias, prejudice or personal knowledge of disputed facts was established.

The Turngrens ask that the summary judgments be vacated on the basis that the trial judge improperly based his decision on the high regard he held for the deputy prosecuting attorney who drafted the affidavit supporting the search warrant and the district court judge who issued it. The Code of Judicial Conduct provides that a trial judge should disqualify himself from a proceeding where he has a personal bias against a party or personal knowledge of disputed evidentiary facts. CJC 3(C)(1)(a).

Here the oral opinion by which the Superior Court judge granted summary judgment on September 23, 1980, concerning which the Turngrens now complain, was not

reported by a court reporter. Either party had the right to have a reporter present but apparently one was not requested. We are reluctant to base a ruling on a matter of this sort based on affidavits of what a judge allegedly said or didn't say where a court reporter could have been requested by any party but was not. *Bich v. General Elec. Co.*, 27 Wn. App. 25, 33–34, 614 P.2d 1323 (1980). In any event, there was a reported transcript of the Superior Court judge's oral opinion of September 30, 1980 on the motions to vacate. The record on that occasion demonstrates without question that the judge's previous decision had not been based on any bias, prejudice or personal knowledge of disputed evidentiary facts, but rather was based on his evaluation that the record was without any issue of material fact.

We have reviewed the Turngrens' remaining arguments and conclude that to the extent they may not be encompassed by our ruling on the other issues herein, they are without merit. The Superior Court did not err by entering summary judgments of dismissal.

Affirmed.

DURHAM, J., concurs.

RINGOLD, J. (dissenting)—The constitutional protection against unreasonable searches and seizures[5] is not a gift bestowed at the pleasure of a benevolent government upon a grateful populace. It is a fundamental and cherished liberty inherent in the idea of a free society. The courts stand as a bulwark protecting the citizen from abuse of the power entrusted to public servants. Judges have a special duty to be solicitous of the claims of citizens who have been

---

[5]U.S. Const. amend. 4 reads in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."

Article 1, section 7 of the Washington State Constitution states:

"Invasion of private affairs or home prohibited. No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

harmed by the overreaching of the government.

In the context of a criminal prosecution, evidence seized during an unreasonable search in violation of the constitution cannot be used against the accused. *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961). A corresponding protection in the civil context requires an avenue of redress where the privacy of our citizens has been invaded by an unreasonable police intrusion.

While it is difficult to balance the legitimate interests of those authorized to enforce the criminal law with the equally (if not more so) legitimate interests of our citizens to be secure from unsolicited intrusions into the privacy of their homes, I feel the majority has tipped the scale too far in the direction of unfettered law enforcement conduct by holding that the Turngrens' claims do not merit a trial. Such a holding can only encourage those who would seek to abolish the hard-won protections from the abuse of governmental power which are embodied in our Bill of Rights.

The facts are simple. Late in the evening, after hours of planning, acting on information from a lone informant subject only to slight, if any, corroboration, the heavily armed King County SWAT team surrounded the Turngren residence, cordoned off the area, evacuated the neighbors, and executed a search warrant seeking automatic weapons, bombs, and drugs. The search warrant was obtained on affidavit made by two police detectives. After several hours' search, finding no contraband, the police departed, leaving the middle-aged Turngrens and their young daughter to clean up the mess and explain to their friends and neighbors, if they could, what had happened.

The Turngrens brought suit against King County and the City of Redmond, alleging improprieties in the processing of the search warrant and violation of their civil rights, causing them damage including mental distress, medical problems, loss of reputation, and humiliation. The trial court granted summary judgment to the defendants, in effect finding that the Turngrens would not be entitled to relief even if their factual allegations were assumed to be

correct. The majority affirms that finding.

I believe that the record in this case justifies a trial on the Turngrens' tort and civil rights claims and would remand for trial on those counts. The record demonstrates genuine issues of material fact sufficient to survive summary judgment.

## MALICIOUS PROSECUTION[6]

The majority affirms the summary judgment as to the common law tort claims because in its opinion the Turngrens failed to "raise a reasonable inference of malicious or reckless conduct on the part of the detectives". While it is true that malice is one of the key elements of malicious prosecution, the other being want of probable cause, *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 125 P.2d 681 (1942), it is well established in our law that the element of malice may be inferred by the trier of fact from the want of probable cause, *Ladd v. Miles*, 171 Wash. 44, 17 P.2d 875 (1932); *Ton v. Stetson*, 43 Wash. 471, 86 P. 668 (1906), or from proof of reckless disregard of the rights of the plaintiffs. *Peasley*, at 502. The abandonment of prosecution, uncontroverted in this cause, is prima facie proof of lack of probable cause, which in turn permits an inference of malice. *Pallett v. Thompkins*, 10 Wn.2d 697, 118 P.2d 190 (1941); *Noblett v. Bartsch*, 31 Wash. 24, 71 P. 551 (1903).

The record before the trial court raises a genuine issue of material fact concerning reckless if not intentional misrepresentations and omissions by the detectives in their affidavit in support of the search warrant. First, the detectives failed to set out all of the material facts giving rise to their determination of probable cause. While the affidavit relates that the informant stated he personally viewed weapons and drugs at the Turngren residence, it fails to relate important facts surrounding the circumstances of the giving

---

[6]For clarity's sake, I refer to all nonconstitutional claims arising from the alleged misstatements in the affidavit for search warrant as a single "malicious prosecution" claim. *See Ladd v. Miles*, 171 Wash. 44, 17 P.2d 875 (1932).

of the informant's tip. The affidavit gives the impression that the informant voluntarily came forward to assist the police with information concerning criminal activity. In actuality, the informant's statements, given in response to police questioning about *his own* criminal activity, could be construed as an effort to exculpate himself and turn police interest away from his own crimes.

On October 25, 1978, a Redmond police detective was contacted by a person to whom the informant allegedly had sold a .38 caliber pistol. The Redmond detective contacted a King County Police detective who ascertained that the pistol had been stolen from a King County residence. The Redmond and King County detectives then contacted the informant, and after reading him the *Miranda*[7] warnings interrogated him about the stolen pistol. It was only then that the informant told the detectives that he knew where other firearms were located in the Juanita–Kirkland area.

None of this history appeared in the affidavit for the search warrant, nor was it related to the magistrate who signed the warrant. The failure of the detectives to reveal to the magistrate the basis for the informant's cooperation is highly significant. It indicates a reluctance on the part of the detectives to relate facts which might have resulted in a denial of the warrant pending further investigation.

Second, the affidavit also greatly overstates the informant's prior track record. The affidavit reads in relevant part:

> that your affiant has discussed the reliability of the said confidential informant with [the Redmond detective] present with me during the making of this affidavit, who has indicated that in the past three months the said informant has given him information relating to stolen property which has led to the recovery of $250 in stolen property and confessions of crime by three parties involved; that [the Redmond detective] has indicated that he has known the informant for approximately one

---

[7]*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

year and a half, that during that time he has received *more than 10 reports on criminal activity in the Redmond/Bellevue area which were personally verified by him through regular police channels independent of said informant;* that [the Redmond detective,] a police officer for two and a half years has indicated belief on the basis of the duration and nature of his relation to the informant, the candor of the informant in discussing that person's history, *the repeated verification of the informant's information, and the lack of any false information given by the informant in the past one and one-half years* that the said information given by the informant is reliable information.

(Italics mine.) The record indicates, however, that the statements concerning the informant's prior reliability were exaggerated and misleading.

The Redmond detective, at his deposition, described in detail[8] his relationship with the informant which began in the spring of 1977 with a routine stop. Then in November 1977 the informant and one of his friends were arrested by the Redmond detective and charged with felony auto theft, having been identified by the owner of the car. Each blamed the other for the theft. The informant told the detective where the car had been left in Oregon.[9] Four days later the informant indicated that he could possibly get the detective information on other criminal activity in the area. The auto theft charges, which were filed as taking and riding, were further reduced and the informant pleaded guilty to a misdemeanor.

The next contact with the informant was in December

---

[8]Although the majority states that "counsel for the Turngrens chose to question the Redmond detective on some but not all of some ten instances evincing the informant's past reliability," the record shows that the questions were of the form "what's the next time you had a discussion with the informant?" and the final incident given was in August 1978, only 2 months prior to the search at Turngrens'. It is reasonable to infer, though counsel never specifically asked, that the detective related the incidents in chronological order.

[9]In his deposition, the detective characterizes the informant's statements as to the location of the car he stole and the culpability of his friend in the theft as the first pieces of reliable information received from the informant.

1977 when the informant told the detective that a friend of his was carrying a concealed firearm in his car without a permit. The friend was stopped by coincidence the next day for a traffic violation and his car searched, but no weapon was found. The friend stated that he had a firearm permit but did not have it with him. No further investigation was made of this suspect. The Redmond detective stated in his deposition that although no weapon was found, he felt that the fact that the suspect did not have his gun permit on his person was corroborative of the informant's story that he had lost it.

In January 1978 the informant told the detective that an early model Corvette automobile had been stolen in the Kirkland area and gave him the name of an alleged thief. The detective verified that such a car had been stolen, there being a notice with an illustration of the car on the bulletin board at the police department, and informed the Kirkland police of the informant's information. At his deposition the Redmond detective stated that as far as he knew, no further investigation was made and no charges were ever filed in connection with this incident.

Also in January 1978 the informant told the Redmond detective that he could get large quantities of amphetamines, having seen "a pillow of speed" at a residence in Redmond and smoked marijuana there. The detective arranged with his superiors to get money for the informant to arrange a "buy," but before anything further could transpire, the informant told the detective that his friends suspected him of talking to the police and he would not go back to the house. The detective attempted to verify the address in a reverse telephone directory but there was no listing for the address which the informant had given him. The detective drove by the house once. No further investigation was made and the informant's story was never verified.

In February 1978 the informant reported that the friend without the gun permit was now carrying his concealed weapon again. No investigation was made at that time, but

in October 1978 the suspect reapplied for a weapons permit, stating that he had lost his prior permit.

In relating his contacts with the informant over the next few months of 1978, the detective stated in his deposition: "In the time period I would say between March, throughout the summer into August, he'd call me occasionally with information that—different information that I couldn't verify because it wasn't important to us." In August 1978 the informant told the detective that he knew where there was stolen property and identified six juveniles as responsible for the thefts. The detective accompanied the informant into a wooded area where they found a camera and some cassette tapes.

The questioning of the Redmond detective at his deposition as to his prior contacts with the informant concluded with this last incident, but it seems safe to assume that unless the informant was very busy between August and October 1978 there was little other information provided to the detective prior to the incident which resulted in the search of the Turngrens' residence. On this record the only verified information given to the detective was that an individual had lost his firearm permit, that a Corvette had been stolen, and that some juveniles had been involved in petty thefts. No charges were ever brought; no arrests were ever made.

The affidavit in support of search warrant, indicating that the informant gave "more than ten reports on criminal activity in the Redmond/Bellevue area which were personally verified" by the detective, is grossly misleading when compared with the informant's actual track record, and contains significant omissions as to the informant's own prior criminal activity known to the detective. It also fails to set out the informant's interest in cooperating with the police.

These misstatements and omissions are not corrected by the fact that the informant was brought before the magistrate issuing the warrant. The Redmond detective in his deposition says he is not sure that the informant was asked

any questions by the magistrate. On the face of the affidavit itself is a handwritten statement by the judge: "informant present and," which indicates, to me at least, that the judge intended to question the informant but did not. The King County detective states that the informant was asked only about his prior knowledge of weapons and his concern for his personal safety and that the Redmond detective gave no further background information in response to a question from the magistrate, but merely stated his conclusion that the informant was reliable.

The importance of full disclosure of the facts relating to the informant's reliability is underscored by the seriousness of his accusations and the fact that the detectives obtained minimal independent corroboration of the informant's story. Prior to applying for the warrant, the detectives had the informant point out in a picture book the weapons he had seen and the police verified that someone named "Keith" lived at the Turngren residence, but no further independent investigation of the material facts was made.

The prima facie want of probable cause, together with the discrepancies between the informant's track record as set out in the affidavit and in the deposition, permit an inference of malice sufficient to survive summary judgment. *Ladd v. Miles,* 171 Wash. 44, 17 P.2d 875 (1932). The determination of a person's state of mind, in this case the presence or absence of malice, is ordinarily for the trier of fact and not for the court at summary judgment. *Preston v. Duncan,* 55 Wn.2d 678, 349 P.2d 605 (1960).

CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. § 1983

The majority holds that the record fails to permit an inference that the alleged reckless disregard for the rights of the Turngrens resulted from official King County policy or practice. In my view the facts and the expert opinion before the court would warrant a reasonable person to infer reckless disregard of constitutional rights resulting from official practice and policy.

The trial court had before it the affidavit of Robert di

Grazia, former police commissioner of Boston, Massachusetts, who had reviewed the record in the case and the relevant prevailing police procedures and standards. His affidavit states his expert opinion that the affidavit for search warrant mischaracterizes the reliability of the informant, that the police inadequately investigated the background of the Turngrens prior to the raid, that lack of supervision by higher–ranking officials permitted lower–ranking personnel to "usurp" authority and responsibility for checking the accuracy of the information received, and that the police displayed reckless disregard for the Turngrens' rights in obtaining and serving the warrant.

An affidavit containing an expert opinion on an ultimate issue of fact may create a genuine issue of material fact sufficient to preclude summary judgment. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 588 P.2d 1346 (1979). Di Grazia's affidavit raises such an issue by stating that the practices of the King County Police resulted in violation of the Turngrens' Fourth Amendment rights.

Having shown genuine issues of material fact, the Turngrens should have their day in court. I would reverse and remand for trial.

Accordingly, I dissent.

Reconsideration denied October 12, 1982.

Remanded to the Court of Appeals August 12, 1983.