[No. 22256–2–I.  Division One.  August 14, 1989.]

ROBERT L. BALDWIN, JR., as *Administrator, Appellant,* v. THE CITY OF SEATTLE, *Respondent.*

---

242

*Lembhard G. Howell,* for appellant.

*A. Richard Dykstra* and *Marcus B. Nash,* for respondent.

WINSOR, J.—Robert Baldwin's estate (Estate) brought a wrongful death action against the City of Seattle (City) alleging that Seattle police officers negligently assaulted Robert Baldwin's barricaded apartment. The Estate also alleged that the police officers' actions violated Baldwin's civil rights under the United States Constitution. The trial court dismissed the civil rights claim at the end of the Estate's case. We affirm.

On March 27, 1984, King County police officers Rayburn and Ryan went to the Yesler Terrace Apartments to evict Baldwin for nonpayment of rent. Baldwin fatally stabbed Rayburn in the chest with a sword. Rayburn managed, however, to fire five rounds from his service revolver as he fell. Baldwin retreated into the apartment and remained there for 17 hours.

Seattle police rapidly responded to Ryan's call for assistance. Lieutenant Wright, acting commander of the East Precinct, assumed command at the scene. Wright, a 15–year veteran of the Seattle Police Department, had been promoted to lieutenant in July 1983. He remained in command during the entire incident, consulting with various superior officers on major decisions. Seattle Police Chief Patrick Fitzsimmons visited the scene twice. Wright's primary objective was to get Baldwin out of the apartment alive.

Wright set up a command post and called in the police department's negotiating team and its Emergency Response Team (ERT). The negotiating team was directed by Sergeant Stringfellow, whose goal was to "get a peaceful surrender". Stringfellow tried unsuccessfully to establish contact with Baldwin for 17 hours. Baldwin's son received a

response from Baldwin while a helicopter flew overhead, but this was not verified by anyone else.

After 17 hours passed without any confirmed sightings or contact with Baldwin, Stringfellow notified Wright that any further attempts at negotiation would be futile. Wright, after consultation with Captain Yumul and Lieutenant Burke, decided that the ERT should make a tactical entry because Rayburn might have wounded Baldwin, and because of worry about vigilantism.

The ERT is a specially trained tactical team whose purposes and functions are set forth in the ERT training manual published by the police department. The team's functions are varied. One is to remove barricaded individuals. The field commander decides whether to use the ERT, but once the field commander gives the ERT its assignment, the ERT determines how to carry out the mission.

The ERT's actions are guided by the 17–page manual, which is divided into 11 sections. The first section, Administration/Organization, describes the composition of the ERT, its purpose, and gives examples of how the ERT should be utilized. The Administration/Organization section closes with a paragraph which states:

> In all incidents, the police role remains the same. It is always to PROTECT LIVES AND PROPERTY. The utilization of a well–trained and coordinated team is in support of this goal.

*Emergency Response Team Manual* ¶ 4.404.0000(3), at 1 (Nov. 10, 1983) (hereinafter *ERT Manual*).

Three sections of the manual, Selection Process, Training, and Operational Standards, emphasize the strenuous nature of ERT duties, and the need for careful screening of personnel. Applicants are required to pass a psychological profile, a rigorous physical test, and be recommended by their supervisors. *ERT Manual* ¶ 4.404.2500, at 3–4. The Operational Standards section alerts ERT members to those acts or omissions which will result in dismissal from the ERT. Included in this list is "family and work pressures resulting in absenteeism or substandard performance."

*ERT Manual* ¶ 4.404.2510(1)(b), at 4. The manual explains why these factors justify dismissal, stating:

> Because the ERT function is tactical (small scale, opportunistic, limited purpose), we must outguess, outshoot, and/or outlast the competition. That means we must be able to maintain control at the scene and seize any opportunities that present themselves; this ability requires training for endurance, stress control, and confidence.

*ERT Manual* ¶ 4.404.2510(1), at 4.

The majority of the manual is devoted to a section entitled "TACTICS." The Tactics section sets forth how the ERT should carry out its various functions. Detailed procedures are set forth for establishing an inner perimeter to contain suspects, arrest procedures, building entries and assaults. Statements restricting the use of firearms are dispersed throughout the Tactics section. The inner perimeter section states that "[m]embers of the team may not fire their weapons except in the *immediate* defense of themselves or others." *ERT Manual* ¶ 4.404.2530(1)(a), at 8. Long riflemen are instructed that they may shoot only if the field commander determines that such action is necessary to protect the life of any person, and only if they are "satisfied that the shot that is being planned is legally and/or morally required and that all other reasonable alternatives have been exhausted or are not appropriate." *ERT Manual* ¶ 4.404.2530(2)(a), at 9. The Tactics section concludes with a paragraph entitled "*RESTRICTIONS TO USE OF FIREARMS AND GRENADES,*" which provides:

> Weapons will not be fired except when ordered by the scene commander *and* the on–scene ERT commander, or in self–defense or to prevent injury to other ERT personnel. "Other ERT personnel" does not include hostages, non–ERT police officers, bystanders, etc.

*ERT Manual,* at 16.

Six members of the ERT mounted the tactical entry of Baldwin's apartment at 6 a.m. on March 28, 1984. The plan was to lob tear gas into Baldwin's apartment, and for the armed ERT team to enter 10 minutes later when a stun grenade would be launched into the apartment. The plan's

implementation, however, was plagued by equipment failure and poor communications.

When the ERT opened the apartment door, Baldwin came out with the sword and struck and wounded one of the officers in the knee. The wounded officer fired his revolver at Baldwin, who retreated into the bathroom. The officers threw a stun grenade into the bathroom when Baldwin opened the bathroom door, sticking out his sword. As the grenade exploded, Baldwin came out of the bathroom with the sword held high. The officers, believing that Baldwin was charging them with the sword, fired their weapons simultaneously. Baldwin received 21 gunshot wounds to his side and back. Baldwin died from his wounds.

The Estate filed this action against the City. None of the police officers were named. The Estate asserted various negligence claims. It also asserted a claim under 42 U.S.C. § 1983 (hereinafter § 1983), alleging that the police officers' use of excessive force violated Baldwin's constitutional rights.

The case was tried to a jury. Retired City of Bellevue Police Chief Van Blaricom testified on behalf of the Estate as an expert witness. Van Blaricom opined that while the Seattle police carried out the negotiations in an appropriate manner, they breached the industry standard by not waiting Baldwin out. Van Blaricom also testified that the tactics used to enter the building were completely improper. He stated that the ERT Manual's Operational Standards section's explanatory paragraph, at page 4, was faultily worded, because

if you inject the position, outshoot, against outlast, what you literally said is take your choice, and that is not an appropriate instruction to [an] emergency response team.

At the close of the Estate's case, the court granted the City's motion to dismiss the § 1983 claim. The jury was instructed on the Estate's other theories of liability, and it rendered a verdict finding the City negligent and Baldwin 92.5 percent comparatively negligent. The jury determined

the Estate's damages to be $1,248.05. After reduction for Baldwin's comparable fault, judgment was entered against the City for $93.60, plus taxable costs.

The Estate appeals contending that the trial court erred in: (1) dismissing its § 1983 claim; (2) excluding the Bellevue Police Department's policy and procedures for handling barricaded persons; and (3) excluding deposition testimony of Fitzsimmons. It seeks a new trial on the § 1983 claim, and attorney fees pursuant to 42 U.S.C. § 1988.

### § 1983 Claim
### Standard of Review

■ The trial court granted the City's motion to dismiss the § 1983 claim at the close of the Estate's case in chief. The standard of review of a motion to dismiss for insufficiency of the evidence was set forth in *Phennah v. Whalen,* 28 Wn. App. 19, 22, 621 P.2d 1304 (1980), *review denied,* 95 Wn.2d 1026 (1981):

> In ruling on a motion to dismiss for insufficiency of evidence either the trial court or the appellate court must accept as true the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced. RCW 4.56.150; *Rosendahl v. Lesourd Methodist Church,* 68 Wn.2d 180, 412 P.2d 109 (1966); *Moyer v. Clark,* 75 Wn.2d 800, 454 P.2d 374 (1969). The motion may be granted only if it can properly be said as a matter of law that there is no evidence or reasonable inference therefrom to sustain a verdict for the nonmoving party. *Miller v. Payless Drug Stores of Wash., Inc.,* 61 Wn.2d 651, 379 P.2d 932 (1963).

The reviewing court does not weigh the evidence, it merely determines whether the nonmoving party's evidence is sufficient to justify, though not to compel, a verdict in its favor. *Gentry v. Greyhound Corp.,* 46 Wn.2d 631, 633, 283 P.2d 979 (1955).

### Municipal Liability
42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

██ Municipalities are "persons" subject to damages under § 1983, but "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). A municipality can be sued directly if the unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690; *St. Louis v. Praprotnik,* 485 U.S. 112, 99 L. Ed. 2d 107, 108 S. Ct. 915, 923 (1988). A municipality may also be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91.

In order to establish a § 1983 claim against a municipality, a plaintiff must: (1) identify a specific policy or custom; (2) demonstrate that the policy was sanctioned by the official or officials responsible for making policy in that area of the city's business; (3) demonstrate a constitutional deprivation; and (4) establish a causal connection between the custom or policy and the constitutional deprivation. *See Praprotnik,* 108 S. Ct. at 924; *Pembaur v. Cincinnati,* 475 U.S. 469, 481–84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986); *Oklahoma City v. Tuttle,* 471 U.S. 808, 822–24, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985) (plurality); *Tuttle,* 471 U.S. at 828–30 (Brennan, J., concurring). Lack of proof on any of the above elements would require dismissal of the action. *Phennah v. Whalen, supra.*

## Policy

The critical issue is whether the Estate presented sufficient evidence to satisfy the first element. The Estate argues that Fitzsimmons is the City's official policymaker

with regard to the operation of the Seattle Police Department, and that he sanctioned two policies which resulted in the unreasonable use of excessive force. First, Fitzsimmons approved the ERT manual, including the sentence in the Operational Standards section that states "the ERT . . . must outguess, outshoot, and/or outlast the competition." The Estate claims that this sentence establishes an unconstitutional outshoot policy. Second, Fitzsimmons decided to leave Wright in place as the field commander, despite Wright's limited experience as a lieutenant.

The City concedes Fitzsimmons is the City's official policymaker. See Seattle City Charter art. 6, § 4 and Seattle Police Department Manual ¶¶ 1.00.060 and 1.08-.055.[1] It contends, however, that the Estate has not demonstrated that Fitzsimmons sanctioned any policies which might have given rise to the alleged constitutional deprivation. We agree.

■ The standards for deciding what constitutes an official policy or custom are crucial because they define the scope of municipal liability under § 1983. *See Monell v. Department of Social Servs., supra.* A policy can be a formal item such as an ordinance, policy statement, regulation, or mayoral order that is adopted and promulgated by the municipality's official decisionmakers. *See, e.g., Monell,* 436 U.S. at 661 n.2 (written pregnancy leave rule); *Brower v. Wells,* 103 Wn.2d 96, 107, 690 P.2d 1144 (1984) (municipal ordinance). A formal manual promulgated by the City's official decisionmaker will satisfy the policy element of a §

---

[1]Seattle City Charter art. 6, § 4 and Seattle Police Department Manual ¶ 1.00-.060 entitled "CHIEF TO MANAGE POLICE DEPARTMENT" provide that [t]he Chief of Police shall manage the Police Department, and shall prescribe rules and regulations, consistent with law, for its government and control; provided, that the Chief of Police shall be responsible to the Mayor for the administration of the Police Department and the enforcement of law."

Seattle Police Department Manual ¶ 1.08.055 provides that "[w]hile employees of the Seattle Police Department are encouraged to participate in community activities, including public speaking events, it must be remembered that the Chief of Police has the ultimate responsibility for formulating and/or interpreting departmental policies and procedures."

1983 action. *Monell v. Department of Social Servs., supra; Brown v. Clewiston,* 848 F.2d 1534, 1539 (11th Cir. 1988) (manual promulgated by the chief of police represented the city's official policy on the use of firearms); *Turngren v. King Cy.,* 33 Wn. App. 78, 85, 649 P.2d 153 (1982) (police *department's* official policy ascertained from a King County Department of Public Safety training bulletin).

The Estate contends that the City sanctioned a tactical policy of excessive force by use of the term "outshoot" in the Operational Standards section's explanatory paragraph. That argument takes the manual's use of the term "outshoot" out of context.

The City's official policy regarding the use of weapons can best be ascertained from the entire 17–page manual. The explanatory paragraph of the Operational Standards section which contains the word "outshoot" is clearly meant to explain to ERT members the reason for the ERT's rigorous dismissal policy. The City's policy on the use of deadly force is set forth in the Administration/Organization and Tactics sections of the ERT manual. These sections contain numerous restrictions on the use of firearms, and they condone the use of weapons only when reasonably necessary. The ERT manual's policy regarding the use of firearms is constitutional on its face. *Cf. Graham v. Connor,* __ U.S. __, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989); *Kirkpatrick v. Los Angeles,* 803 F.2d 485 (9th Cir. 1986) (policy that admonishes employees to act reasonably in considering a range of factors before strip searching police officers accused of theft is not unconstitutional on its face).

■ Where a policy is not itself unconstitutional "considerably more proof than the single incident will be necessary in every case to establish both the requisit fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." (Footnotes omitted.) *Tuttle,* 471 U.S. at 824 (plurality); *see also Kirkpatrick,* 803 F.2d at 492. Here, there is no such proof. The evidence established that three prior incidents involving barricaded persons who had injured Seattle police officers

ended with Seattle police officers safely removing the barricaded individuals.

Cities may, however, be liable for a single decision by municipal policymakers under certain circumstances. *Pembaur*, 475 U.S. at 480. Liability may attach where the final policy–making authority with respect to the subject matter in question makes a deliberate choice to act unlawfully. *Pembaur*, at 481–83.[2] The Estate contends that Fitzsimmons' decision to leave Wright as field commander, rather than replacing him with a more experienced or higher ranking officer, satisfies that requirement. We disagree.

Fitzsimmons' choice in this case was to leave a midlevel police officer as field commander. The Estate produced no evidence that Fitzsimmons: (1) instructed the field commander to send in the ERT, rather than waiting for Baldwin to voluntarily surrender; (2) had any reason to believe that the field commander would depart from official city policy in carrying out his duties;[3] or (3) observed the field commander violating city policy without taking any action. In fact, the Estate's own expert testified that the situation was being handled correctly when Fitzsimmons visited the scene.

Under these facts, even if the chosen field commander wrongfully carried out his duties, no wrong can be ascribed to the City's policymaker, Fitzsimmons. Thus, the City could only be liable for the field commander's actions under

---

[2]Some examples of cases where municipal liability has attached from a single action include: *Pembaur v. Cincinnati, supra* (county attorney directed deputy sheriffs to enter a clinic without consent or a search warrant to serve capias to two clinic employees); *Owen v. Independence*, 445 U.S. 622, 63 L. Ed. 2d 673, 100 S. Ct. 1398 (1980) (city council passed resolution firing plaintiff without a pretermination hearing); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 69 L. Ed. 2d 616, 101 S. Ct. 2748 (1981) (city council canceled license permitting concert because of dispute over content); *McKinley v. Eloy*, 705 F.2d 1110 (9th Cir. 1983) (city manager fired plaintiff for exercising his First Amendment rights).

[3]Absent knowledge of an unconstitutional custom or usage, a policymaker may presume that "subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *Praprotnik*, at 130.

a theory of respondeat superior. *See Praprotnik,* 108 S. Ct. at 925. That is not a proper ground for municipal liability under § 1983. *Praprotnik,* 108 S. Ct. at 923; *Monell,* 436 U.S. at 691. The trial court properly dismissed the Estate's § 1983 claim.

## EVIDENTIARY RULINGS

The Estate assigns error to two evidentiary rulings. it claims that the trial court improperly excluded the Bellevue Police Department's procedure manual for handling barricaded persons and that the trial court erroneously excluded portions of Fitzsimmons' deposition that the Estate offered into evidence pursuant to CR 32(a)(2). We need not reach the merits of these contentions because these evidentiary issues relate exclusively to the Estate's negligence claim. The Estate did not appeal from the final judgment entered on that claim.

## ATTORNEY FEES

The Estate's request for its appellate attorney fees is denied because it is not the prevailing party. *See* 42 U.S.C. § 1988.

The judgment is affirmed.

PEKELIS, J., and DEIERLEIN, J. Pro Tem., concur.