703 A.2d 1315

**FORD MOTOR COMPANY**

v.

**Nollie P. WOOD et al.**

No. 280, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Jan. 8, 1998.

2

**4**

6

**8**

Robert Dale Klein, Michael T. Wharton, Annapolis (Debra S. Block and Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., Annapolis, Steven R. Williams and McGuire, Woods, Battle & Boothe, L.L.P., Richmond, VA, on the brief), for appellant.

Deborah K. Hines, Washington, DC (Shepard A. Hoffman, Brian C. Parker and Gebhardt & Smith, Baltimore, on the brief), for appellee Hood.

Edward J. Lilly (Gary J. Ignatowski, Steve W. Smith, Scott D. Schellenberger and the Law Offices of Peter G. Angelos, on the brief), Baltimore, for appellee Grew.

Argued before SALMON, EYLER and SONNER, JJ.

EYLER, Judge.

This appeal involves two wrongful death and survival actions filed by appellees Nancy L. Grewe, individually, Rosanna Wood, individually and as personal representative of the Estate of Nollie P. Wood, and Marjorie Grewe, as personal representative of the Estate of Keith K. Grewe, that were consolidated for trial in the Circuit Court for Baltimore City. The parties agree that appellees' decedents died of mesothelioma, but disagree that the evidence at trial demonstrated that their diseases and resulting deaths were caused by their exposures to the asbestos-containing brake and clutch products of the appellant, Ford Motor Company ("Ford").[1] Ford raises a number of challenges to the judgments entered in favor of appellees including challenges to the jury selection process and challenges to certain of the trial court's evidentiary rulings. In addition, Ford maintains that the evidence in

---

[1] These cases were tried with a third case that did not proceed to verdict and in which Ford was not a defendant.

At the time suit was initiated in these cases, Ford was only one of many manufacturers or suppliers of asbestos-containing products named as a defendant in these cases. By virtue of settlements and voluntary dismissals, most of which occurred prior to jury selection, Ford was the only remaining defendant in these cases at the time the jury began its deliberations.

the Wood case was insufficient to support the judgment against Ford. Finally, Ford asserts that the trial court should have applied the noneconomic damages cap to the survival/loss of consortium portions of the judgments. For the reasons set forth below, we shall reverse the judgment in favor of Mrs. Wood and affirm the judgment in favor of the Grewe appellees.

## QUESTIONS PRESENTED

Ford inquires on appeal:

1. Whether the trial court committed reversible error by not striking two jurors for cause.

2. Whether the trial court committed reversible error by denying Ford its right to Maryland Rule 2–512(c) information.

3. Whether the trial court committed reversible error in refusing to ask Ford's voir dire questions.

4. Whether the trial court committed reversible error in overruling Ford's *Batson* challenges.

5. Whether there was sufficient evidence of Mr. Wood's exposure to Ford's brake and clutch parts to submit to the jury the issue of substantial factor causation in the *Wood* case.

6. Whether the trial court committed reversible error in refusing to permit Ford to introduce evidence of exposure of Grewe and Wood to other asbestos products to prove alternative causation.

7. Whether the trial court committed reversible error in refusing to apply the noneconomic damages cap to the survival/loss of consortium claims.

In addition to those questions presented by Ford, Mrs. Wood's arguments regarding Ford's question 5 raise the novel question of whether Ford can be held liable for failure to warn of the latent dangers of asbestos-containing brake and clutch products that it neither manufactured nor placed into the stream of commerce.

10

Nollie Wood was employed as a garageman at the United States Post Office Preston Street Garage in Baltimore City from 1948 to 1952. Although Mr. Wood did not work on brakes and clutches, there was evidence that Mr. Wood worked "within feet" of mechanics who did work on brakes and clutches at a rate of between three and nine jobs a day. The brake and clutch parts contained asbestos and produced dust when they were replaced. In particular, Ford acknowledged that its brake linings, presumably similar in composition, were 40 to 60 percent chrysotile asbestos by weight. Dust was created during the replacement of brakes in a number of different ways. During normal use of brakes, dust accumulates in the brake drums, and it was a common practice at the Preston Street Garage to use an air hose to blow out the dust from old brakes. The use of the air hose caused asbestos dust to be blown throughout the garage. In addition, during the process of replacing brakes, workers were required to grind the brake shoes so that the brakes properly fit the vehicles. This grinding process also would create dust. Finally, dust was created when the garage was swept at the end of each day.

It is undisputed that a majority of the vehicles that were serviced at the Preston Street Garage were Ford vehicles that were manufactured in the late 1920s and early 1930s. It further is undisputed that the vehicles did not contain their original brake and clutch parts by the time Mr. Wood began working at the Preston Street Garage in 1948. The two coworker witnesses who testified on behalf of Mr. Wood could not identify the manufacturers of the replacement brakes and clutches that were used at the Preston Street Garage between 1948 and 1952, and there was no documentary evidence, such as invoices or purchase orders, identifying the manufacturer of the brake and clutch products to which Mr. Wood was exposed.

Mr. Wood was diagnosed with mesothelioma in January, 1990, and he died on May 26, 1990. Experts testifying on

behalf of Mr. Wood offered the opinion that, to a reasonable degree of medical certainty, Mr. Wood's mesothelioma was caused by his exposure to respirable asbestos fibers emanating from brake and clutch work at the Preston Street Garage between 1948 and 1952. Ford contends that expert testimony excluded by the trial court would have shown that the most likely cause of Wood's mesothelioma was his exposure to amphibole asbestos fibers in ship insulation when he worked as a longshoreman from 1942 until 1947.

The jury awarded $2,000,000 for Mrs. Wood's wrongful death claim, $840,000 for her loss of consortium claim, and $3,467,727 for the survival action, $3,450,000 of which was for noneconomic damages, for a total verdict of $6,307,727. The trial court denied Ford's post-trial motion to apply to the survival action and loss of consortium claim the statutory cap on noneconomic damages set forth in § 11–108 of the Courts & Judicial Proceedings Article ("CJ").

Keith Grewe was employed as a mechanic at Foreign Motors in Baltimore City from 1957 through December of 1992, where he regularly worked on brakes and clutches. Mr. Grewe worked with Ford brakes at least weekly. Mr. Grewe testified that when he worked on Ford vehicles, he used Ford replacement brake and clutch parts because they fit better than the parts supplied by other companies. Mr. Grewe was exposed to dust containing asbestos during the repair of brakes when the worn parts were removed and compressed air was used to blow the dust from the drums. Mr. Grewe testified that dust would get all over him and that he could taste the dust and would breathe it. Mr. Grewe also was exposed to dust when installing new brakes since he was required to use a file, hacksaw, and sandpaper in preparing the asbestos facings for installation.

In October 1992, at age 56, Mr. Grewe sought medical attention for symptoms related to fluid which had accumulated around his lungs. Mr. Grewe was diagnosed with mesothelioma in January 1993, and he died on October 14, 1993. Mr. Grewe's medical experts testified that, to a reasonable degree

of medical certainty, Mr. Grewe's occupational exposures to Ford's asbestos-containing brake and clutch products were a substantial factor in causing his mesothelioma and resulting death. Ford contends that the trial court erred in excluding evidence that would have demonstrated that Mr. Grewe was exposed to asbestos while working as a sheet metal worker in the mid–1950s, and while using asbestos-containing joint compound while remodeling homes in the mid to late 1960's.

The jury awarded $4,000,000 for Mrs. Grewe's wrongful death claim, $1,000,000 for her loss of consortium claim, and $3,069,934 for the survival action, $3,000,000 of which was for noneconomic damages, for a total verdict of $8,069,934. The trial court denied Ford's post-trial motion to apply to the survival action and loss of consortium claim the statutory cap on noneconomic damages set forth in CJ § 11–108.

## DISCUSSION

### I.

### Jury Selection

■ Jury selection in Maryland is regulated by Title 8, Subtitle 2 of the Courts and Judicial Proceedings Article. *Hunt v. State*, 345 Md. 122, 143, 691 A.2d 1255, *cert. denied*, —— U.S. ——, 117 S.Ct. 2536, 138 L.Ed.2d 1036 (1997). "Modeled after the Jury Selection and Service Act of 1968, 28 U.S.C. 1861–69 (1994), the selection process set forth in that subtitle necessarily embodies the Sixth Amendment's right to an impartial jury." *Id.* "A fundamental tenet underlying the practice of trial by jury is that each juror, as far as possible, be 'impartial and unbiased.'" *Langley v. State*, 281 Md. 337, 340, 378 A.2d 1338 (1977) (citing *Waters v. State*, 51 Md. 430, 436 (1879)). "The objective of this tenet is to assemble a group of jurors capable of deciding the matter before them based solely upon the facts presented, 'uninfluenced by any extraneous considerations....'" *Id.*

## A. *Challenges for Cause*

In a civil trial, a "party may challenge an individual juror for cause. A challenge for cause shall be made and determined before the jury is sworn, or thereafter for good cause shown." Md. Rule 2–512(e); see also CJ § 8–210(b)(5). "In determining whether a juror should be excused for cause, the general question is whether a person holds a particular belief or prejudice that would affect his ability or disposition to consider the evidence fairly and impartially and reach a just conclusion." *King v. State*, 287 Md. 530, 535, 414 A.2d 909 (1980). "[T]he proper focus is on the venire person's state of mind, and whether there is some bias, prejudice, or preconception." *Davis v. State*, 333 Md. 27, 37, 633 A.2d 867 (1993).

During the course of voir dire, the trial court asked the prospective jurors if there were "any members of this panel or any member of their immediate family who has been involved or had a claim filed for an asbestos-related disease?" Appellant asserts that, in response to this question, seven panel members explained how their relatives "had been involved or had a claim filed for an asbestos-related disease" as follows:

Juror No. 199—His brother worked at Domino Sugar and filed a claim. The trial court struck him without inquiring whether this fact would interfere with his ability to be fair to the parties.

Juror No. 155—Her father had black lung; her mother receives his pension for it. The trial court explained to the juror that "that is not asbestos." When asked if this fact would interfere with her ability to be fair to the parties, she stated: "I don't know. I don't know. I really don't. I am not sure."

Juror No. 98—Her brother-in-law had a claim that has been resolved; he receives residual benefits. When asked if this fact would interfere with her ability to be fair to the parties, she stated: "I don't think so."

Juror No. 109—His uncle recently settled a suit with an unknown asbestos company. When asked if this fact would

interfere with his ability to be fair to the parties, he stated: "I am unsure. Yes, I guess."

Juror No. 195—His father has a claim for asbestos. The trial court struck him without asking whether this fact would interfere with his ability to be fair to the parties.

Juror No. 187—Her father has an asbestos case and was represented by Peter Angelos (the same law firm that represented Mr. Grewe). The trial court struck her without asking whether this fact would interfere with his ability to be fair to the parties.

Juror No. 200—"[His] fiancee is seeking an asbestos claim." The trial court struck him without inquiring whether this fact would interfere with his ability to be fair to the parties. (Appellant's Brief at 7–8).

The trial court struck all of the foregoing jurors for cause with the exception of Juror No. 98. Although the defendant companies [2] had moved to strike Juror No. 98 for cause as well, the trial court denied that motion without an explanation. Ford contends that the trial court's refusal to strike Juror No. 98, or at least make further inquiry of her, constituted an abuse of discretion. Ford contends that Juror No. 98's response to the trial court's inquiry was just as equivocal as the responses of Jurors Nos. 155 and 109. Further, Ford cites the trial court's failure to question Jurors Nos. 199, 195, 187 and 200 as support for its assertion that the trial court lacked a rationale for refusing to strike Juror No. 98. Ford implies that the trial court's differential treatment of these jurors was arbitrary and capricious.

We note first of all that the trial court's reasoning for questioning some of the jurors but not others is apparent from a review of the record. Specifically, each of the jurors that the trial court struck without questioning had a very close

---

**2.** In the proceedings below, an objection made by one of the defendants was made on behalf of all of the defendants, and an objection made by one of the plaintiffs was made on behalf of all of the plaintiffs, unless the individual defendant or plaintiff expressly opted out of the objection.

relationship (brother, father, or fiancee) with an individual who had an asbestos-related claim. Further, Jurors Nos. 195 and 200 were related to individuals with pending, as opposed to resolved, claims. Jurors Nos. 98 and 109 had more attenuated relationships with individuals, brother-in-law and uncle respectively, who had resolved asbestos-related claims. Juror No. 155 revealed that her father had black lung disease, not an asbestos-related disease. The trial court explained to the juror that black lung was not asbestos-related, but nevertheless asked her whether that fact would interfere with her ability to judge the case fairly and impartially.

Similarly, we do not agree with Ford that Juror No. 98's response was just as equivocal as responses supplied by Jurors Nos. 155 and 109. The hesitancy and uncertainty of the responses given by Jurors Nos. 155 and 109 is apparent from the face of the trial transcript. By contrast, the response "I don't think so" may express a degree of hesitancy or no hesitancy at all depending upon its delivery. In quoting Juror No. 98, Ford adds emphasis to the word "think" and informs us that it was preceded by a hesitant pause. That information, however, is not contained in the record. The trial judge had the opportunity to observe Juror No. 98's facial expressions, intonation, and all of the subtle nuances that would render "I don't think so" equivocal or unequivocal. Accordingly, we must defer to the trial judge's ability to interpret the response.

█ Ford also challenges the trial court's denial of the defendant companies' motion to strike Juror No. 123. In response to the trial court's question regarding hardships, Juror No. 123 revealed that she had an appointment on June 25, 1996, "a follow-up [for] lung cancer." Ford maintains that the fact that the plaintiffs had mesothelioma, a cancer affecting the lungs, and that Juror No. 123 had lung cancer, required the trial court to strike Juror No. 123 for cause or, at the very least, make further inquiry of her regarding whether that fact would affect her ability to be fair and impartial. Ford argues that the trial judge's introductory description of

the cases was insufficient to signal to prospective jurors that the cases were about a type of cancer affecting the lungs. Hence, the trial court's general question regarding bias would not necessarily be sufficient to uncover any bias Juror No. 123 may have had. We disagree with Ford's position.

In *Davis v. State*, 333 Md. 27, 633 A.2d 867 (1993), the defendant requested that the trial judge ask during voir dire whether any member of the venire was employed as a law enforcement officer or had friends or relatives employed in the law enforcement field. The defendant in *Davis* contended that he had a right to know such information because the prosecution's case hinged upon the testimony of a police officer, and such a person would be more likely to believe a police officer than a criminal defendant. The trial judge refused the defendant's request, and the Court of Appeals affirmed. The Court held that, although the trial court could, in its discretion, have asked such a question, it was not required to ask such a question.

The Court first noted that the scope and form of voir dire rests firmly within the trial judge's discretion, and further, that the purpose of voir dire is "to ascertain 'the existence of cause for disqualification and for no other purpose.'" *Id.* at 34, 633 A.2d 867 (quoting *McGee v. State*, 219 Md. 53, 58, 146 A.2d 194 (1959) (quoting *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556 (1952) (citations omitted))). Although parties to a jury trial have a right to have questions propounded to prospective jurors concerning a specific cause for disqualification, *id.* (quoting *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627 (1958)), the Court determined that the question proposed by Davis was not such a question because an affirmative answer would not automatically disqualify the prospective juror. The Court further stated that

[i]n general, the professional, vocational, or social status of a prospective juror is not a dispositive factor establishing cause to disqualify. Rather, the proper focus is on the venire person's state of mind, and whether there is some bias, prejudice or preconception. Short of those instances where there is a demonstrably strong correlation between

the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror.

*Id.* at 37, 633 A.2d 867.

 Just as the professional, vocational or social status of a prospective juror does not establish that the juror is biased, neither does a prospective juror's affliction with a particular disease establish that the juror is biased. Just as a police officer would not necessarily be more likely to believe a police officer, a juror suffering from lung cancer is not necessarily more likely to believe plaintiffs who had a similar disease. The fact of Juror No. 123's lung cancer arguably might influence her sympathy for the plaintiffs. As we stated recently, however, a jury is not expected to judge a case without sympathy. *See Fowlkes v. State,* 117 Md.App. 573, 584, 701 A.2d 862 (1997). ("[A] jury is expected to decide a case *without* bias or prejudice; it is not expected to do so without sympathy but is expected to follow the court's instruction that it not be unduly *swayed* by it.") (emphasis in original). Accordingly, the trial court did not err in refusing to strike Juror No. 123.

 Similarly, the trial court did not abuse its discretion in refusing to voir dire Juror No. 123 regarding her illness. As we discuss more fully below, when a party requests inquiry regarding a specific area of potential bias, the trial court must engage in such inquiry. *Davis,* 333 Md. at 47, 633 A.2d 867. In this case, there was no request for voir dire regarding a specific area of potential bias.[3]

---

**3.** Ford's proposed voir dire regarding lung cancer and other lung diseases sought very broad and general information. It was not crafted to elicit specific areas of potential bias. Additionally, as follow-up, the trial court was not requested to elicit the juror's belief whether her illness was related to asbestos exposure. Given that the trial court only questioned the panel regarding asbestos-related claims, and not asbestos-related illnesses, such a question arguably would not have been covered by the trial court's voir dire.

While we do not find reversible error, we note that a better approach in this case would have been to allow more expansive voir dire on issues of lung disease and, in introductory remarks, to explain to the panel that mesothelioma is a cancer affecting the lungs. *See Fowlkes,* 117 Md.App. at 586, 701 A.2d 862. Such an approach would not significantly lengthen voir dire and would decrease the possibility that a prospective juror who should be disqualified for cause will not be identified.

### B. *Rule 2–512(c) Information*

Ford next contends that the trial court committed reversible error by denying Ford's right to receive Rule 2–512(c) information. Rule 2–512(c) provides as follows:

Jury List.—Before the examination of jurors, each party shall be provided with a list of jurors that includes the name, age, sex, education, occupation, and occupation of spouse of each juror and any other information required by the county jury plan. When the county jury plan requires the address of a juror, the address need not include the house or box number.

Such information is derived from juror qualification forms that are completed by each prospective juror. *See* Md.Code Ann., CJ, § 8–202 (1995 Repl.Vol., 1997 Suppl.). Relying on the rationale of *Booze v. State,* 347 Md. 51, 68–69, 698 A.2d 1087 (1997),[4] Ford argues that the purpose of providing parties with Rule 2–512(c) information is to enable them to exercise their peremptory challenges intelligently and strategically. Ford further argues that such information is useless to the parties if it is inaccurate.

Prior to voir dire, one of the defendant companies indicated to the trial court that the voir dire process of a prior trial before the court had revealed certain inaccuracies in the juror

---

4. In *Booze,* the Court of Appeals held that Rule 4–312(g) requires that, to the extent possible, parties should have the full panel of prospective jurors before them before being required to exercise their peremptory challenges. 347 Md. at 69, 698 A.2d 1087.

occupational information that had been supplied to the parties. Counsel asked that the trial court avoid a similar situation in this case by verifying the jurors' occupational information during voir dire. Although the trial judge initially indicated a willingness to accommodate the parties, when he was asked again after voir dire had commenced, he declined to engage in such questioning based upon the holding in *Davis, supra.*

█ In *Davis,* the Court of Appeals expressly declined Davis's invitation to broaden the scope of mandatory voir dire to include inquiry that would aid a party in the exercise of its peremptory challenges. Instead, it reaffirmed the principle that any questioning that seeks information to aid the parties in their exercise of peremptory challenges is wholly discretionary with the trial judge. In particular, the Court held that occupational information generally is the type of information that falls into the category of discretionary, as opposed to mandatory, voir dire. *Davis,* 333 Md. at 37–38, 633 A.2d 867. Generally, the trial judge may, but need not, ask questions regarding occupation. *Id.* Absent some alternative remedy provided by Rule 2–512(c) or the statutory scheme of Title 8, Subtitle 2 of the Courts & Judicial Proceedings Article, the reasoning in *Davis* applies to Ford's 2–512(c) challenge.

Section 8–201 provides that each circuit court shall maintain a jury selection plan. Section 8–202 provides that each jury selection plan shall specify detailed procedures to be followed by the jury commissioner or clerk in selecting jurors at random from voter registration lists or other sources, CJ § 8–202(2), and provides for a juror qualification form which asks each potential juror certain information including occupation and occupation of spouse. CJ § 8–202(5). Section 8–205 provides that, when directed by the circuit court, the clerk or jury commissioner shall publicly draw at random, from the master jury wheel, the names of as many persons as are required for jury service. Section 8–206 provides for the mailing of juror qualification forms to those persons selected pursuant to § 8–205, with instructions that the form be com-

pleted and returned within ten days. Section 8–206(c) provides that

> [w]hen a person appears for jury service, or is interviewed by the jury judge, clerk or jury commissioner, the person may be required to fill out another juror qualification form in the presence of the jury commissioner or the clerk of the court, and at that time, if it appears warranted, the person may be questioned, but only about his responses to questions contained on the form and grounds for his excuse or disqualification. The clerk or jury commissioner shall note any additional information thus acquired on the juror qualification form and transmit it to the jury judge.

While § 8–206 gives the trial court the power to seek updated juror qualification information at the time a prospective juror appears for jury service, it does not require that such information be questioned or updated. Rule 2–512(c) merely provides that the information contained on the jury qualification form be transmitted to the parties. It does not require that the parties receive more recent or current information.

Subsection 8–211(b) provides that any party to a civil case may, before voir dire begins, move to stay the proceedings on the ground of substantial failure to comply with the jury selection procedures of Subtitle 2. Subsection 8–211(d) provides that where the trial court finds that there has been a substantial failure to comply with the selection procedures of Title 8, other than those contained in § 8–103,[5] and that the failure is likely to be prejudicial to the moving party, the court shall stay the proceedings pending selection of the jury in conformance with Title 8.

---

5. Section 8–103 provides that "[a] citizen may not be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin, or economic status." Where there has been a violation of this section, the likelihood of prejudice need not be demonstrated, but instead, is presumed. *See* CJ § 8–211(d)(1).

Title 8 provides a statutory remedy only in those instances in which the moving party has demonstrated (1) a substantial failure to comply with the selection procedures of Title 8, and, (2) when the violation is other than a § 8–103 violation, that the moving party is likely to be prejudiced by the substantial failure. Further, a § 8–211 challenge is timely only if made prior to voir dire. That is true even if the party was unaware of the reasons for the challenge prior to the commencement of voir dire. *See Hunt*, 345 Md. at 143–46, 691 A.2d 1255 (preventing, under § 8–211(a), the criminal equivalent of § 8–211(b), defendant in capital murder case from raising challenge post-voir dire).

In this case, the defendants did state their challenge prior to the commencement of voir dire. They did not demonstrate, however, either substantial failure to comply with the jury selection process of Title 8, or a likelihood of prejudice. In order to obtain a stay at this juncture, the defendants would have had to demonstrate (1) substantial noncompliance with the statutes governing the dissemination and completion of juror qualification forms (e.g., due to clerical error, juror qualification forms sent to prospective jurors do not include a question regarding the occupation of the juror's spouse), and (2) that the defendants likely would be prejudiced by such substantial noncompliance.

While it is true that a few inconsistencies in the occupational information were revealed during voir dire, such inconsistencies could have been due to recent changes in occupation, and are not evidence of substantial failure to comply with the procedures governing dissemination and collection of juror qualification forms. Further, given that the discrepancies were uncovered after the commencement of voir dire, Ford, under the reasoning of *Davis*, was entitled to verification of such information only if it could demonstrate that the information was linked to probable bias. That is a demonstration Ford was unable to make.

We are cognizant of the fact that, as a practical matter, a party often will not learn of inaccuracies in Rule 2–512(c)

information until after the commencement of voir dire. It is at this point that trial judges, under their broad discretion to fashion voir dire, have the ability to rectify such discrepancies.

## C. *Ford's Proposed Voir Dire*

Further, Ford contends that the trial court committed reversible error when it refused to ask the venire panel the voir dire proposed by Ford. Ford submitted proposed voir dire containing forty-four questions. The trial court declined to ask the voir dire submitted by Ford or any of the other parties, and instead, limited voir dire to the following nine questions:

1. Do the jurors know the decedents?
2. Do the jurors have any connection with any named company (defendants)?
3. Do the jurors know Plaintiffs' counsel?
4. Do the jurors know Defendants' counsel?
5. Do the jurors know the potential product identification witnesses?
6. "Are there any member of this panel or any member of their immediate family who has been involved or had a claim filed for an asbestos-related disease?"
7. Do the jurors know the medical expert witnesses?
8. "If you do think that you have what is an extraordinary reason why you could not stay to a conclusion of this trial, please stand."
9. "Is there any other reason at all that I have not specifically questioned you about, any other reason at all that would interfere with your ability to be fair to the parties in this case if you were selected as a juror?"

▆▆▆ Ford emphasizes the fact that, notwithstanding that the trial was expected to last up to four weeks, the trial court's voir dire took only one hour to complete. The expected length of a trial, however, does not dictate the length of voir dire. The scope and form of voir dire is left almost wholly to the discretion of the trial judge with the exception of those limited areas that are mandatory areas of inquiry under Maryland law. These mandatory areas recently were de-

scribed by the Court of Appeals in *Boyd v. State*, 341 Md. 431, 671 A.2d 33 (1996):

> [T]he mandatory scope of voir dire in Maryland only extends to those areas of inquiry reasonably likely to reveal cause for disqualification. There are two areas of inquiry that may uncover cause for disqualification: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service . . .; or (2) "an examination of a juror . . . conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him."
>
> . . . In other words, we have held that the well-settled "right" to examine potential jurors, inherent in the constitutional right to fair trial and an impartial jury, translates into a defendant's right to have certain questions propounded to the jurors where the proposed questions "concern a specific cause for disqualification."

*Id.* at 435–36, 671 A.2d 33 (citations omitted). When a party requests inquiry regarding a specific cause for disqualification, refusal to engage in such inquiry will constitute reversible error. *Davis*, 333 Md. at 47, 633 A.2d 867. In particular,

> where the parties identify an area of potential bias and properly request voir dire questions designed to ascertain jurors whose bias could interfere with their ability to fairly and impartially decide the issues, then the trial judge has an obligation to ask those questions of the venire panel. Merely asking questions, such as, "is there any reason why you could not render a fair and impartial verdict," is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case.

*Id.*

 Ford argues that a number of its questions "sought to reveal prejudices gained through education or training in the medical field or other employment." Our review of such questions, however, reveals that they did not seek information

regarding the panel members' various states of mind. Instead, they sought the type of occupational information that is not mandatory under the holding in *Davis*. *Davis* does not foreclose the possibility that, in some instances, there may be a "demonstrably strong correlation" between a particular occupation and a particular bias (e.g., doctors in a medical malpractice case). No such correlation, however, was demonstrated in the instant case.

A few other questions were directed to uncover information regarding the panel members' experiences with cancer and other lung problems, and the panel members' experiences with Ford products generally, not Ford friction products in particular. Even assuming that these questions were likely to uncover potential biases, Ford did not identify the areas of potential biases for the trial court and then request that its questions be asked. Instead, when the trial judge asked the parties whether they had any additional voir dire, Ford simply asked that all of its proposed voir dire be read:

THE COURT: ... For the defense, any request for additional voir dire?

MR. WILLIAMS: Yes, Your Honor, for the record, Ford would go ahead and request that the voir dire questions that we submitted be read and specifically I can give you a list of those.

THE COURT: Every area that you have asked has been fairly covered by the Court's previous questions.

MR. WILLIAMS: Very good, Your Honor.

In the absence of the identification of a specific question or questions coupled with an explanation that might have caused the trial court or this Court to come to a different conclusion, it appears that Ford's lengthy voir dire was either fairly covered by the trial court's voir dire or sought general information useful to the parties in the exercise of their peremptory challenges rather than specific causes for disqualification.

### D. *Ford's Batson Challenge*

Finally, Ford contends that the trial court committed reversible error by refusing to conduct a *Batson* inquiry prior to

the swearing of the jury. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that, under the Equal Protection Clause of the Fourteenth Amendment, a criminal defendant who is a member of a cognizable racial group can challenge the prosecution's use of peremptory challenges to exclude jurors of the defendant's race. The Supreme Court has since applied *Batson* in a civil case. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). In addition, in *Gilchrist v. State*, 340 Md. 606, 620–21, 667 A.2d 876 (1995), the Court of Appeals held that *Batson* applied to peremptory challenges aimed at excluding white prospective jurors from the venire based on their race.

In *Gilchrist*, the Court of Appeals adopted the following three step process, first set forth by the Supreme Court in *Batson*, to determine whether the exercise of peremptory strikes is discriminatory:

> First, the complaining party has the burden of making a prima facie showing that the other party has exercised its peremptory challenges on an impermissible discriminatory basis, such as race or gender....

*Gilchrist*, 340 Md. at 625, 667 A.2d 876. Generally, a prima facie showing of discrimination is satisfied by showing a pattern of strikes against same race jurors. *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–23.

> Second, once the trial court has determined that the party complaining about the use of the peremptory challenges has established a prima facie case, the burden shifts to the party exercising the peremptory challenges to rebut the prima facie case by offering race neutral explanations for challenging excluded jurors....

> Finally, the trial court must "determine whether the opponent of the strike has carried his burden of proving purposeful discrimination."

*Gilchrist*, 340 Md. at 625–26, 667 A.2d 876 (citations omitted).

In the instant case, Ford made a prima facie showing of discrimination by pointing out to the trial court

that appellees had used all of their strikes to strike white panel members. The trial court did not proceed to the second step, however. Instead, it ruled that Ford had not made a prima facie showing of discrimination because the racial composition of the jury approximated the racial composition of Baltimore City. A comparison of the racial composition of the jury to the community from which it is drawn, however, is not the test required by *Batson.* When, as in this case, a party demonstrates a pattern of discriminatory strikes, the trial court must inquire whether the challenged party had race-neutral reasons for exercising his or her strikes. Then, the trial court must determine whether the opponent of the strike has met its burden of proving purposeful discrimination.

Ultimately, at a post-trial hearing, the trial court did conduct a full *Batson* hearing. At that time, appellees offered the following reasons for their strikes:

MR. IGNATOWSKI: Number 94 was an auditor, and for that reason she was struck. This obviously—this case was going to involve economic values, economic figures. That was the reason that that juror was struck by the plaintiffs.

Number 157 was a high school teacher. There were a number of high school teachers in the venire that were part of the venire that indicated an unwillingness to serve.

Number 157, I don't believe, fell into that category, but we picked this jury in late May, and from the discussions of the whole panel, from the responses of the whole panel, there was some reluctance to serve by some teachers because it was the end of the school year, and we struck that individual who was a high school teacher.

Also, numbers 94 and 157 both had postgraduate training, and that is evident from their juror selection list, and that was an additional reason that we used in our process to strike those two individuals.

Number 91, Juror Number 91, again, was an administrator. She had 20 years of education, and she was a wife of an attorney whom we believe to be an attorney who was

affiliated or at least affiliated in the past with a defense firm in the Baltimore Metropolitan area. . . .

With respect to Juror Number 99, she also, I believe, was a teacher, had 16 years of education, and that was the reason that we used to strike Number 99.

With respect to Juror Number 202 who is listed as a banker, again, this case was going to involve a number of economic issues as is evident from the evidence in the case and evident from the analysis of the economist that testified in the case, and that was the reason that we struck Juror Number 202.

\* \* \*

MS. HINES: . . . Just briefly, I would concur with everything that Mr. Ignatowski has said, and just to make the record clear, we set forth in our opposition Juror Number 94, who was the auditor, and that was also the reason we struck him as well, and there is excerpts from the transcript in our memo where he basically set forth that he would not be able to support himself if he had to sit on a trial that was a duration that this trial was expected to last, and that was an additional reason for our striking—

\* \* \*

THE COURT: Number 157, John Wilcox, also said he couldn't return.

MS. HINES: That was exactly the next point that I was going to make, and our transcript is attached to our opposition with respect to Juror Number 157 who was a high school teacher, and because of the size of his school, he had indicated he would have difficulties.

Likewise, that is why we also struck, although that individual did not set forth any reasons on the record, as an additional reason as to why Juror Number 99 who is also a teacher was struck for the additional reasons.

The foregoing reasons were race-neutral and were accepted by the trial court. Accordingly, we will not question the validity of those reasons on appeal. As we stated in *Ball v.*

*Martin,* 108 Md.App. 435, 672 A.2d 143, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996),

> [i]n a practical sense, if, after the party opposing the strike has presented a prima facie showing, the proponent thereof proffers a facially neutral reason *that is accepted by the trial court,* then an appeal on *Batson* principles has little, if any, chance of success, given that the credibility of the proponent offering the reasons is, as it is generally, for the trial court—not an appellate court—to determine.

*Id.* at 456, 672 A.2d 143 (discussing *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834, *reh. denied,* 515 U.S. 1170, 115 S.Ct. 2635, 132 L.Ed.2d 874 (1995), and *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991))(emphasis in original).

Ford argues that the timing of the trial court's *Batson* inquiry constitutes reversible error. Ford argues that, after a four week trial, the events surrounding jury selection had to be reconstructed; memories were not as fresh. Further, there was a tremendous disincentive for the trial court to sustain challenges after the trial had already completed. Finally, the lapse in time gave appellees additional time "to fine-tune their reasons," and, as the appellees' reasons originally were submitted in document filings, the trial court did not have an opportunity to evaluate their credibility.

We note first that the trial court did have an opportunity to judge the credibility of appellees' counsel. Although appellees initially submitted the reasons for their strikes in writing, they ultimately gave their reasons to the trial judge on the record in a post-trial hearing. With respect to Ford's other contentions, we agree that ordinarily a *Batson* inquiry should be conducted at the time the challenge is made. The trial judge in this instance, however, did not purposefully defer the *Batson* inquiry in this case. Instead, the judge thought that the inquiry was unnecessary based upon his initial determination that Ford had not made out a prima facie case of discrimination. Under these circumstances, we cannot say that the timing of the *Batson* inquiry is grounds for reversal.

 Both this Court and the Court of Appeals have remanded cases to trial courts for *Batson* hearings long after the jury selections and trials in such cases. *See State v. Gorman,* 324 Md. 124, 596 A.2d 629 (1991); *Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988); *Chew v. State,* 71 Md.App. 681, 527 A.2d 332 (1987), *judgment vacated after remand,* 317 Md. 233, 562 A.2d 1270 (1989). Accordingly, a post-trial *Batson* hearing is not *per se* unreliable. While certainly, there are difficulties inherent in reconstructing events for such a hearing, *see Chew,* 317 Md. at 239, 562 A.2d 1270, in this case, the trial judge necessarily found that the events were reconstructed to his satisfaction. We have no basis for disagreeing with that determination.

## II.

### Motion for Judgment in *Wood*

In deciding whether to grant a motion for judgment, a trial court "assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom, and considers them in the light most favorable to the party against whom the motion is made." *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328, 389 A.2d 887 (1978). If, when viewed in that light, "there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact at issue, then the trial court would be invading the province of the jury by [granting a motion for judgment]." *General Motors Corp. v. Lahocki,* 286 Md. 714, 733, 410 A.2d 1039 (1980).

 Ford contends that the issue of substantial factor causation in the *Wood* case should not have been submitted to the jury because there was insufficient evidence that Ford's products were a substantial contributing factor of Mr. Wood's mesothelioma. We agree.

Among the questions set forth on the jurors' verdict sheet was the following:

Do you find by a preponderance of the evidence that Mr. Wood's exposure to asbestos-containing products manufactured, supplied, installed and/or distributed by [Ford] was a substantial contributing factor in the development of his mesothelioma?

 In order to demonstrate that Mr. Wood was exposed to Ford's asbestos-containing products, Mrs. Wood was required to present evidence tending to show that Mr. Wood inhaled asbestos fibers produced by Ford's products. *See Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 211–12, 604 A.2d 445 (1992). Mr. Wood did not do any work with brake or clutch products. Instead, he had bystander exposure to brake and clutch products and the asbestos fibers emanating therefrom. Accordingly, Mrs. Wood was required to demonstrate that Mr. Wood worked in proximity to others using ***Ford's*** brake and clutch products with some frequency and regularity. *ACandS v. Asner*, 344 Md. 155, 171, 686 A.2d 250 (1996); *Balbos*, 326 Md. at 210, 604 A.2d 445. While Mrs. Wood presented sufficient evidence from which a jury could infer that Mr. Wood's exposure to asbestos-containing brake and clutch products was sufficient to have substantially caused his mesothelioma, she did not present sufficient evidence that Mr. Wood was exposed to ***Ford's*** brake and clutch products with the requisite degree of frequency, proximity or regularity.

Mr. Wood worked at the Preston Street Garage between 1948 and 1952. The Ford trucks that were worked on at the garage during that time period were model years 1928 to 1932, and the automobiles were model years 1938 to 1939. While it was undisputed that the vehicles did not contain their original brake and clutch parts during the relevant time period, neither of Mr. Wood's two co-worker witnesses could identify the manufacturer or supplier of the replacement brake and clutch parts that were used. Nevertheless, Mrs. Wood contends that there was enough circumstantial evidence to demonstrate that Mr. Wood was exposed to Ford's brake and clutch products.

Specifically, both Mr. Grewe and Mr. Grossblatt, one of Mr. Grewe's co-worker witnesses, testified that they used Ford replacement brake and clutch products on Ford vehicles at Mr. Grewe's place of employment from 1957 through December, 1992.[6] Further, Mr. Grewe testified that Ford products were used on Ford vehicles because they fit better than products supplied by others. In addition, Mrs. Wood admitted into evidence two Model A instruction books, one that was supplied with 1928 Model A vehicles, and one that was supplied with 1931 Model A vehicles. Each of these books contained the following language:

When repairs or replacements are necessary, it is important that you get genuine Ford parts.

Finally, Mrs. Wood contends that there was evidence that Ford had contracts to supply replacement brakes to the Postal Service. Mrs. Wood argues that, taken together, this evidence demonstrates that Ford brakes and clutches were applied frequently and regularly to Ford vehicles at the Preston Street garage between 1948 and 1952.

 We agree that exposure to a defendant's asbestos-containing products may be demonstrated circumstantially. *Balbos*, 326 Md. at 210, 604 A.2d 445. The evidence cited by Mrs. Wood is insufficient, however, to create a jury question on substantial factor causation. First, we note that, contrary to Mrs. Wood's assertion, there is no evidence that Ford had contracts to supply replacement brakes to the Postal Service. The sole support of Mrs. Wood's contention is the following testimony by Mr. Anderson, Ford's corporate designee:

Q. During the time that you were employed by Ford, were you aware of files that involved government contracts supplying—Ford supplying asbestos-containing brakes or friction products during those years?

A. In a few instances, on friction materials, yes, I was aware of some special military vehicle operations, SMVO.

---

6. Although these witnesses testified in the *Grewe* case, Mrs. Wood adopted their testimony as evidence in her case.

Q. Excuse me, special military—

A. Yes, SMVO, special military vehicle operations.

Q. Other than that, were you aware of any other government contracts that Ford had with the U.S. Government to supply brakes?

A. No.

Q. Did Ford have contracts, that you are aware of, to supply brakes to the U.S. Postal Service?

A. I expect they did, but I don't have any direct knowledge of that.

Mr. Anderson simply did not testify that Ford had contracts to supply the Postal Service with replacement brakes. Second, Mr. Grewe's and Mr. Grossblatt's testimony regarding the practices of an entirely different garage during an entirely different time period is not evidence of the practices of the Preston Street garage between 1948 and 1952. *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. 665, 670, 602 A.2d 1182 (1992) ("The mere 'conjecture' that half of Anchor's asbestos products may have come from Raymark over a thirty year period is not sufficient to prove that the plaintiff Zenobia was exposed to Raymark's products during the two year period that he worked at Maryland Shipbuilding and Drydock or that Raymark's products were a substantial factor in causing the plaintiff Zenobia's injuries."). That leaves Mr. Grewe's statement that Ford brakes and clutches fit Ford vehicles better, and the recommendation contained in the Model A instruction books. These pieces of evidence must be considered in context.

Mr. Anderson, Ford's corporate designee, testified that Ford does not require that its replacement parts be used on its vehicles, and that there is a significant replacement parts industry. Further, Ford occupies only approximately 15% of the replacement parts market. Mr. Anderson testified that it is common for mechanics to use non-Ford replacement parts, including non-Ford brake and clutch parts, on Ford vehicles because other companies make and sell such parts much cheaper than does Ford. Indeed, when Mr. Anderson was a

mechanic in the 1950's, it was his practice to use non-Ford replacement parts because of the cost savings. With respect to the language contained in the manuals, indicating the importance of using Ford replacement parts, Mr. Anderson testified that such language is standard in the automotive industry and is nothing more than a marketing message. Even considering the evidence in a light most favorable to Mrs. Wood, the evidence simply was too thin to demonstrate that Mr. Wood frequently and regularly worked in proximity to mechanics applying Ford brake and clutch products.

Alternatively, Mrs. Wood contends that, regardless of who manufactured the replacement parts, there was sufficient evidence from which the jury could infer that Ford had a duty to warn of the dangers involved in replacing the brakes and clutches on its vehicles. We agree with Ford that the case simply was not tried and submitted to the jury on this theory. The jury verdict sheet asked the jury to consider whether Mr. Wood was exposed to Ford's asbestos-containing products. During the course of the trial, the products were identified as brake and clutch linings. Indeed, Mrs. Wood's counsel asked the trial court to revise the jury verdict sheet to allow the jury to consider whether Ford had a duty to warn of the dangers of replacing brakes and clutches regardless of the origin of the brakes and clutches. The trial court declined Mrs. Wood's request on the basis that the case had not been tried on that theory.

We agree with the trial court's determination on that issue. Specifically, counsel for Mrs. Wood argued in her opening statement that counsel would demonstrate that Mr. Wood was exposed to Ford's asbestos-containing brakes. It was not until after the close of all the evidence, during a discussion of the jury verdict form, that Mrs. Wood articulated for the first time her theory that Ford's duty to warn stemmed from its sales of the vehicles rather than its sales of brakes. Ford had not had the opportunity to defend the case on this new theory, and thus, submission of the case on this theory would have been prejudicial and in error.

■ Mrs. Wood seems to read the record differently and apparently believes the case was tried and submitted to the jury on a sale of the vehicle theory. Even if that were the case, we would not find liability under that theory as a matter of law. Mrs. Wood's phrasing of the issue, that Ford had a duty to warn of the dangers associated with the foreseeable uses of its vehicles, obscures the fact that she really is attempting to hold Ford liable for unreasonably dangerous replacement component parts that it neither manufactured nor placed into the stream of commerce.

The parties have not favored us with much law on this subject, and our own research has not uncovered any case on point. As a general matter, however, those courts that have considered the issue have held that a vehicle manufacturer may be held liable in damages for defective component parts manufactured by another only if the vehicle manufacturer incorporated the defective component into its finished product. *See, e.g., Baughman v. General Motors Corp.*, 780 F.2d 1131, 1132 (4th Cir.1986); *Exxon Shipping Co. v. Pacific Resources, Inc.*, 789 F.Supp. 1521, 1527 (D.Hawai'i 1991); *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959). Such liability, often referred to as "assembler's liability," is justified because the assembler derives an economic benefit from the sale of a product that incorporates the component; the assembler has the ability to test and inspect the component when it is within its possession; and, by including the component in its finished product, the assembler represents to the consumer and ultimate user that the component is safe. *See Baughman*, 780 F.2d at 1132–33; *Pacific Resources, Inc.*, 789 F.Supp. at 1527. *See also Phipps v. General Motors Corp.*, 278 Md. 337, 343, 363 A.2d 955 (1976) (discussing justifications for generally imposing a duty of strict liability upon manufacturers or sellers of defective products).

Courts have noted that such justifications usually are not advanced by making a manufacturer liable for component parts that it did not market or place into the stream of commerce, and thus, have limited liability to those entities in

the defective component's chain of distribution. *See Baughman,* 780 F.2d at 1132–33 (refusing to hold truck manufacturer liable for defective wheel rim that was placed on vehicle after sale and that the manufacturer did not supply); *Pacific Resources,* 789 F.Supp. at 1527 (refusing to hold designer of mooring terminal liable for defective replacement chain); *Spencer v. Ford Motor Co.,* 141 Mich.App. 356, 367 N.W.2d 393, 396 (1985) (refusing to hold vehicle manufacturer liable for defective wheel rim component added after sale of vehicle). *See also Newman v. General Motors Corp.,* 524 So.2d 207, 209 (La.App. 4 Cir.1988) (refusing to hold truck manufacturer liable for defective ratchet assembly it did not incorporate into its product); *Walton v. Harnischfeger,* 796 S.W.2d 225, 227–28 (Tex.App.–San Antonio, 1990) (crane manufacturer had no duty to warn or instruct about rigging it did not manufacture, incorporate into its crane, or place into the stream of commerce).

As at least one court has noted, limiting liability to those in the chain of distribution is not only equitable, it preserves a bright line in the law of strict liability:

> [T]he need to preserve a bright line in the law of strict products liability (that is, a chain of title rule) is evident. For example, if an assembler were strictly liable for an "identical" replacement part purchased from a third party, the court would be forced to conduct an inquiry into whether the original and the replacement parts were manufactured by the same company.... If so, whether the original and replacement parts were sufficiently similar? ... If so, whether the original and replacement parts were manufactured utilizing a similar process and similar materials? If so, at what point in time did endorsement by the assembler of the component manufacturer come to an end, if ever? Each of these questions would have to be answered in order to support liability under an "endorsement" theory, notwithstanding the other justifications for strict liability.

*Pacific Resources,* 789 F.Supp. at 1527–28 (citations omitted).[7]

Indeed, the only context, of which we are aware, in which a court has found an assembler liable for a replacement component it did not sell is where the replacement component was incorporated into the finished product during the assembler's warranty. *See Morris v. American Motors Corp.,* 142 Vt. 566, 459 A.2d 968, 40 A.L.R.4th 1207 (1982). The rationale for finding liability in such a case, however, was that the assembler, a vehicle manufacturer, led the plaintiff to believe that he was dealing with the assembler when he obtained the replacement part. 142 Vt. 566, 459 A.2d 968, 40 A.L.R.4th at 1215.

Similarly, a finding of liability may be justified if the plaintiff demonstrates that the assembler engaged in a concerted action with others to market, distribute and conceal the dangers of the defective component. *See Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d 289, 582 N.Y.S.2d 373, 375, 591 N.E.2d 222, 224 (1992); *Cousineau v. Ford Motor Co.,* 140 Mich.App. 19, 363 N.W.2d 721, 729–30 (1985). We would agree with the Court of Appeals of New York, however, that "[p]arallel activity among companies developing and marketing the same product, without more, . . . 'is insufficient to establish the agreement element necessary to maintain a concerted action claim.'" *Rastelli,* 582 N.Y.S.2d 373, 591 N.E.2d at 224 (quoting *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)).

---

7. During the proceedings below, Mrs. Wood's counsel asked the trial court not to submit a strict liability count to the jury, but instead, to submit the case only on a negligence theory. Counsel indicated that they may not have met the burden required by strict liability in that they may not have demonstrated that Ford supplied the brakes to which Mr. Wood was exposed. On appeal, Mrs. Wood apparently has abandoned the idea that there is a distinction between negligence and strict liability in this regard. Nevertheless, we note that, regardless of whether Ford's duty to warn sounds in negligence or strict liability, it has a duty to warn only by virtue of its manufacture or sale of unreasonably dangerous products. This is not, for example, a case based on negligent instruction as there is no evidence that anyone relied on instructions supplied by Ford.

■ Assuming all requirements are met, both the warranty theory set forth in *Morris, supra,* and a concert of action theory will impose liability upon a vehicle manufacturer for a component part that it did not place into the stream of commerce. Both theories, however, require some affirmative conduct or fault on the part of the vehicle manufacturer *linked to the specific product that caused the plaintiff's injuries.* Short of a demonstration of a similar degree of fault linked to the specific components that caused the plaintiff's injuries, we would be unwilling to hold that a vehicle manufacturer has a duty to warn of the dangers of a product that it did not manufacture, market, sell, or otherwise place into the stream of commerce.

The cases that Mrs. Wood cites, for the proposition that a manufacturer has a duty to warn of dangers inherent in maintaining and repairing the manufacturer's products, do not persuade us to the contrary. *Bich v. General Electric Co.,* 27 Wash.App. 25, 614 P.2d 1323 (1980); *Stewart v. Scott–Kitz Miller Co.,* 626 P.2d 329 (Okla.App.1981); *Krutsch v. Walter Collin GmBh,* 495 N.W.2d 208 (Minn.App.1993). In each of these cases, the plaintiff was injured by the manufacturer's product, not by a replacement component part manufactured by another many years later.

In *Bich,* the plaintiff was injured in an explosion that occurred while he was changing a fuse to a potential transformer manufactured by General Electric (GE). 614 P.2d at 1325.

> The GE transformer Bich checked was housed in a metal cubicle located approximately 14 feet off the plant floor. The cubicle works like a drawer with the transformer and its fuses housed within the metal cabinet. When the drawer is opened, the circuit automatically breaks; when the drawer is closed, the circuit is complete.
>
> Bich replaced the GE fuses with Westinghouse fuses. Both the GE and Westinghouse fuses were labelled 14,400 volts and .5E; they were the same length, 11½ inches. Although the Westinghouse fuses were slightly larger in

> diameter, they fit readily into the clips designed to hold the GE fuses. Bich closed the drawer and waited approximately 30 to 60 seconds to see if the new fuses would hold. As he reopened the drawer, electric current arced from the opening followed immediately by an explosion and fire. Although the Westinghouse and GE fuses were similar in appearance and labeling, the Westinghouse fuses had a longer time-delay curve than the GE fuses. Bich was severely burned in the explosion.

*Id.* 614 P.2d at 1325–26. The court first noted that sufficient evidence existed to support a finding that the transformer itself was defectively designed. With respect to a duty to warn, the court agreed with GE that it *"had no duty to warn in 1969 of a fuse Westinghouse manufactured in 1973. ..."* *Id.* 614 P.2d at 1328 (emphasis added). Instead, the jury could only have found that GE had a duty to warn of the time-delay characteristics of its own fuses.[8] *Id.* "It would have been a simple and inexpensive matter for GE to have included on its fuses a warning not to substitute fuses or to have given information regarding the time-delay characteristics of its fuses." *Id.*

In *Stewart,* it was a defectively designed forklift manufactured by the defendant that caused the plaintiff's injuries. While the plaintiff was standing on the lifting platform 16 feet above the ground, the machine's lifting apparatus failed, and the platform and plaintiff fell to the ground. *Id.* at 330. During a prior repair, some bolts had been removed and were reinserted backwards causing the ultimate failure of the forklift. *Id.* The plaintiff alleged that the lift was defectively designed because the manufacturer had failed to fashion the guide bolts and their housings in such a way that maintenance personnel could not later insert them backwards. *Id.* Alterna-

---

**8.** We note, however, that the court's holding that there was a duty to place a warning on the GE fuses is problematic since it was not the GE fuses that ultimately caused the plaintiff's injuries. A better analysis is that there was a duty to design the transformer and fuses in such a manner that only GE fuses fit or to place a warning on the transformer instructing users to use only GE fuses.

tively, the plaintiff alleged that the manufacturer could have made the forklift safe by placing warnings on the lift advising maintenance personnel and users of the potential danger and of the need to perform a functional check of the equipment after the servicing or repairs to make sure the bolts were correctly inserted. *Id.* The court held that the plaintiff had adequately plead a cause of action based on dangerous design defect and duty to warn. *Id.* at 331.

In *Krutsch*, it was the defendant manufacturer's lead extruder machine that caused the plaintiff's injuries. The machine in question was a large hydraulic press used to make lead bullets. ˙The plaintiff had been trained by the manufacturer in the use of the machine, but not in the repair of the machine. When the machine broke down, the plaintiff opined that it was not functioning because there was air in the hydraulic cylinder and that he could fix the machine by "bleeding" the cylinder. After consulting a partial copy of the manufacturer's manual, which did not contain any information on bleeding the cylinder, the plaintiff took a wrench and began to turn a pressure release bolt attached to the machine's hydraulic cylinder. The bolt contained a small hole through which fluid could flow from the cylinder. The plaintiff turned the bolt too far, and highly pressurized hydraulic fluid was injected into his thumb causing severe injuries. The court held that the question of whether the manufacturer had a duty to warn of the hazards of bleeding the cylinder was a question of fact.

In both *Bich* and *Krutsch*, the plaintiffs were injured during the repair of the defendants' products. They were injured, however, by the defendants' products. Had the products been designed differently to begin with, the accidents in each case could have been averted. *Stewart* is even more distinguishable. In that case, the plaintiff was injured during the normal operation of the product after it had been faultily repaired.

For all of the reasons set forth above, we will reverse the judgment of the trial court in *Wood.*

## III.

### Exclusion of Evidence of Exposures to Other Companies' Asbestos–Containing Products

Pursuant to the trial court's direction, counsel for the Grewes supplied the trial court and all parties with a chart indicating all motions in limine previously filed in the case of *ACandS v. Asner, et al.,* Case No. 93149701. The *Asner* case was an asbestos products liability case that had been tried before the same trial judge, the Honorable Edward J. Angeletti, in November 1993. The law firm that represented the Grewes also represented the plaintiffs in *Asner,* and, with the exception of Ford, many of the companies that originally were defendants in the instant case also were defendants in the *Asner* case. The chart supplied by counsel for the Grewes also indicated the disposition of each motion. In their covering letter, the Grewes informed the trial court that they were adopting all of the motions that the plaintiffs had filed in *Asner.* Counsel for Mrs. Wood filed a similar adoption, and Ford filed oppositions. One of the motions adopted by the appellees was a motion in limine to exclude evidence of exposures to asbestos-containing products of manufacturers other than those who were parties at the time of trial. That motion had been granted by the trial court in *Asner* and was granted again in this case.

Subsequent to the trial court's ruling in this case, the Court of Appeals issued its decision in *Asner, supra,* 344 Md. at 155, 686 A.2d 250. In *Asner,* the Court vacated the judgment and remanded the case for a new trial on other grounds. The Court did not resolve the issues presented by the motion in limine, noting that the record did not make plain the purpose for which the defendants sought to admit such evidence. The Court did, however, discuss the issues in order to provide guidance to the trial court on remand. In particular, it agreed with plaintiffs that evidence of other exposures would be irrelevant if the only purpose of the evidence was to show that a plaintiff's exposure to the asbestos-containing products of a non-party was greater than the plaintiff's exposure to the

asbestos-containing products of the defendant. *Id.* at 174–75, 686 A.2d 250. In that vein, the Court repeated the following admonition it had first stated in *Balbos:*

"[N]o supplier enjoys a causation defense *solely* on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other -[identified] suppliers."

*Asner,* 344 Md. at 175, 686 A.2d 250 (quoting *Balbos,* 326 Md. at 209, 604 A.2d 445) (emphasis supplied by *Asner* Court). It further noted, however, that

[w]hether evidence of exposure to the asbestos-containing products of non-parties is relevant is controlled by the purpose for which such evidence is being offered. Such evidence is not *per se* irrelevant. Consequently, it would be a rare case in which a court could impose a blanket ban in advance of trial, inasmuch as the evidentiary setting in which the evidence would be offered ordinarily would be unknown.

*Id.* at 174, 686 A.2d 250. The Court then went on to discuss the context in which admission of such evidence would be proper:

A factual defense may be based on the negligible effect of a claimant's exposure to the defendant's product, or on the negligible effect of the asbestos content of a defendant's product, or both. In such a case the degree of exposure to a non-party's product and the extent of the asbestos content of the non-party's product may be relevant to demonstrating the non-substantial nature of the exposure to, or of the asbestos content of, the defendant's product. [Footnote omitted.] But, a defendant would not ordinarily generate a jury issue on lack of substantial factor causation only by showing the dangerousness of a non-party's product to which the claimant was exposed. Ordinarily a defendant would have to follow up the evidence of exposure to the products of non-parties with evidence tending to prove that the defendant's product was not unreasonably dangerous or was not a substantial causal factor. Under these circum-

stances the proposition that the defendant's product is not a substantial cause may be made more probable by evidence tending to prove that the claimant's disease was caused by the products of one or more non-parties. *See, e.g., Becker v. Baron Bros.* [138 N.J. 145], 649 A.2d 613 (N.J.1994) (whether processed chrysotile in brake products posed a risk of causing mesothelioma in users was a sharply disputed issue of fact at trial, so that trial court erred in instructing as a matter of law that the products were defective without a warning).

*Id.* at 176–77, 686 A.2d 250.

 Ford argues that the type of defense to which *Asner* refers is exactly the type of defense that Ford attempted to put on in the instant case. In particular, Ford defended itself based upon the opinions of its expert witnesses that processed chrysotile in friction products cannot cause mesothelioma. Ford notes that its defense theory is made much more plausible by identifying for the jury another more likely cause of Mr. Wood's and Mr. Grewe's diseases, *i.e.*, by demonstrating that each was exposed to nonfriction asbestos products containing amphibole forms of asbestos (such as amosite and crocidolite).[9] While we agree with Ford's statement of the law, an examination of Ford's proffers reveals that it did not possess sufficient evidence to demonstrate such alternative causation. More particularly, Ford would have had to demonstrate that Mr. Grewe's exposures to amphibole asbestos fibers were sufficient to constitute a substantial factor in causing his mesothelioma. If such exposures were incapable of causing Mr. Grewe's mesothelioma, they do not make Ford's defense theory any more likely. Given our other

---

9. The essential principle of Ford's defense theory is that chrysotile fibers, because they are shorter and more easily dissolved by the human body than amphibole fibers (such as crocidolite and amosite), are much less likely to remain intact in the body long enough to do the cellular damage that ultimately may result in mesothelioma. Of course, plaintiffs and their experts do not agree that chrysotile is innocuous or incapable of producing mesothelioma in humans.

rulings in the *Wood* case, we need only examine Ford's proffers in *Grewe*.

Ford proffered certain excerpts of the videotape deposition of Mr. Grewe, and answers to interrogatories, that established that Mr. Grewe had been exposed to asbestos-containing joint compound when he remodeled homes in the mid to late 1960's. The only joint compound that Mr. Grewe recalled using was a product called "Gold Bond." It was undisputed, however, that Gold Bond contained only chrysotile fibers and not amphibole fibers. Accordingly, this evidence would not have demonstrated Mr. Grewe's exposure to amphibole fibers.

Ford also proffered portions of Mr. Grewe's discovery deposition, and answers to interrogatories, that would have established that he installed hot air furnaces in homes for a year or more prior to 1957. During such work, Mr. Grewe installed sheet metal pipe that was covered with strips of asbestos cloth. There was no evidence that Mr. Grewe ever disturbed the cloth so as to create dust when he was installing the pipe. Further, there was no evidence that the cloth was composed of amphibole fibers. In any event, the jury did receive information regarding Mr. Grewe's installation of furnaces in the late 1950's and his use of joint compound in the 1960's. When Ford's counsel cross-examined Lewis Rubin, M.D., one of plaintiffs' experts, he asked Dr. Rubin to read to the jury a one page summary of Mr. Grewe's asbestos exposure. That summary included the following:

... Mr. Grewe indicated that beginning in the mid to late 1960's he personally used joint compound while remodeling homes as a side job.

He recalled exposure to asbestos-containing dust when he used, mixed and sanded joint compound. He recalled using asbestos-free joint compounds by the late 1970's.

Mr. Grewe also stated that for about a year in the mid 1950's he performed sheet metal work installing new forced hot air furnaces in residences.

He recalled that strips of asbestos cloth approximately six inches by one-quarter inch in various lengths were incorpo-

rated into the sheet metal pipe work he installed on top of the furnaces. He neither handled nor cut the asbestos cloth.

Ford additionally proffered that, had it been permitted, it would have cross-examined Samuel Hammar, M.D., a pathologist and an expert witness for the plaintiffs, regarding Mr. Grewe's exposures to crocidolite and amosite. Given that there was no evidence of such exposures, such questioning would have been improper.

Finally, Ford proffered that John Craighead, M.D., a pathologist, would have testified that it was Mr. Grewe's exposures to amosite and crocidolite, rather than his exposures to brake and clutch products, that caused Mr. Grewe's mesothelioma. An expert's opinion testimony is admissible only if it is supported by a sufficient factual basis. *See* Rule 5–702(3). Given that there was no factual basis to support Dr. Craighead's opinion, it was inadmissible.

## IV.

### Statutory Cap on Noneconomic Damages

The jury awarded a total of four million dollars in noneconomic damages, one million of which was for loss of consortium, in the *Grewe* case. In a post-trial motion Ford requested that the trial court apply to that award the cap on noneconomic damages set forth in CJ § 11–108.[10]

CJ § 11–108 provides in pertinent part as follows:

(b) *Limitation of $350,000 established.*—(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

---

**10.** Ford also requested that the trial court apply the cap to the Wood verdict. Given that we are reversing the Wood judgment, we need not discuss Ford's motion regarding *Wood*. Ford did not seek application of the cap to the wrongful death awards because both Mr. Wood and Mr. Grewe died prior to October 1, 1994, the effective date of the wrongful death cap. *See* CJ § 11–108(b)(2).

In *Owens–Illinois v. Armstrong*, 326 Md. 107, 604 A.2d 47, *cert. denied*, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992) (hereinafter *Armstrong II* ), the Court of Appeals first considered application of this section to an asbestos-related personal injury case. The plaintiff in that case had been diagnosed with asbestosis less than a year after the effective date of the statute, but the medical evidence demonstrated that his disease developed well before the effective date. Accordingly, the defendant argued that a cause of action "arises" when the injury is discovered, i.e., "arises" means the same as "accrues" as that term is used in Maryland's statutes of limitations. The Court disagreed and held, instead, that a cause of action "arises" when all of the elements of the cause of action are present. *Id.* at 121, 604 A.2d 47. In both a negligence action and a strict liability action, the last element to occur is the injury. *Id.* at 121–22, 604 A.2d 47. Thus, a cause of action for negligence or strict liability arises when the injury first occurs. *Id.* at 122, 604 A.2d 47.[11]

In a conventional personal injury action such as a vehicular tort, it is quite easy to pinpoint the date that the injury occurs. As the Court of Appeals noted, however, "identifying the time at which an asbestos-related injury came into existence is usually not a simple task. Due to the latent nature of asbestos-related disease, experts and courts alike have had difficulty in pinpointing its onset." *Id.* In the case of asbestosis, there are experts willing to testify that asbestosis occurs only when there has been a functional impairment of the lungs and others willing to testify that inhalation of asbestos fibers causes injury to cells, tissues and/or organs long before a disease is diagnosable. *Id.* at 122–23, 604 A.2d 47(discussing *Lloyd E. Mitchell v. Maryland Cas. Co.*, 324 Md. 44, 64, 66–67, 595 A.2d 469 (1991)).

---

11. The injury must be one that the law recognizes as compensable. If certain anatomical changes occur in a person as a result of a latent process, in some instances, the appearance of symptoms will make the condition a legally compensable injury. By contrast, a condition such as cancer is a compensable injury when it comes into existence even without symptomatology.

Relying upon the testimony of Owens–Illinois's expert, that the usual latency period for the development of asbestosis is twenty years, the Court of Appeals concluded as follows:

Based on Owens–Illinois'[s] expert's testimony, it is reasonable to assume that Armstrong's asbestosis took approximately twenty years to develop. Since his exposure began in the early 1940's, the most reasonable conclusion is that his asbestosis developed at least by the mid–1960's. Even assuming that the initial damage to Armstrong occurred in 1963, the last year in which he worked in the shipyards, the disease "ordinarily" would have developed by 1983 and under "unusual" circumstances even earlier. The only reasonable conclusion, even viewed in the light most favorable to Owens–Illinois, is that Armstrong had asbestosis prior to July 1, 1986. Consequently, we affirm the Court of Special Appeals' holding that Armstrong's damage award is not controlled by the cap on noneconomic damages.

*Id.* at 124, 604 A.2d 47.

■■■ Mr. Grewe first began experiencing symptoms in October, 1992, and was diagnosed with mesothelioma in January, 1993. The plaintiffs, however, presented unrebutted expert testimony that mesothelioma generally begins to grow at least ten years prior to the development of symptoms. Despite this evidence, Ford urges us to conclude that Mr. Grewe's cause of action arose in October, 1992, when he first began experiencing symptoms. Ford argues that the cap statute requires the determination of the exact date a cause of action arises, and that such a date can be determined with precision only by examining when the individual plaintiff began experiencing symptoms or when the plaintiff was diagnosed with a disease, whichever occurs first.

In essence, Ford argues a departure from *Armstrong II* as the *Armstrong II* Court did not base its holding upon a determination of when Mr. Armstrong began experiencing symptoms of asbestosis. Ford argues, however, that *Armstrong II* is distinguishable because the medical evidence in that case demonstrated that the plaintiff developed asbestosis

at least by the mid–1960's. Given that it was "inconceivable that Armstrong's asbestosis came into existence between July 1, 1986 and his [diagnosis] in May 1987," *Armstrong II*, 326 Md. at 123, 604 A.2d 47 (quoting *Owens–Illinois v. Armstrong*, 87 Md.App. 699, 727, 591 A.2d 544 (1991), *aff'd in part and reversed in part*, by citing case (hereinafter *Armstrong I*)), the Court of Appeals was not required to determine exactly when Mr. Armstrong contracted asbestosis. *Id.* Ford argues that as the date of manifestation of disease approaches the effective date of the statute, it becomes more important to determine exactly when the injury actually occurred.

Recently, we rejected a similar argument in *Anchor Packing Co. v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5, *cert. granted sub nom. on other grounds, Porter Hayden v. Bullinger*, 346 Md. 373, 697 A.2d 112 (1997). In *Grimshaw*, we addressed the application of the cap statute to claims for asbestos-related mesothelioma. Preliminarily, we rejected the plaintiffs' contention that *Armstrong II* held that the cap did not apply to latent injury cases. We noted, instead, that *Armstrong II* held only that the statute was inapplicable under the particular facts of that case where evidence demonstrated that the plaintiff's injuries occurred prior to the effective date of the statute. Further, we reiterated our holding in *Armstrong I* that

[t]o have a cause of action based on claims of product liability or negligence law submitted to the jury, the plaintiff must produce evidence of a legally compensable injury.

87 Md.App. at 734, 591 A.2d 544.

We then turned our attention to the question of when a legally compensable injury occurs in an asbestos-related injury case. The defendants had argued that injury or harm does not arise until the symptoms of the disease become apparent. They argued that basing the determination of injury upon symptomatology is a less speculative approach than trying to determine the date the disease began to develop. We chose to rely upon a determination of the date that an injury in fact

came into existence, and rejected defendants' contention that such an approach was too speculative:

> We hold, therefore, that an injury occurs in an asbestos-related injury case when the inhalation of asbestos fibers causes a legally compensable harm. Harm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer. We, therefore, reject appellants' assertion that the injury or harm does not arise until the symptoms of the disease become apparent.

*Grimshaw,* 115 Md.App. at 160, 692 A.2d 5.

We then proceeded to examine the evidence before us to determine whether there was a factual basis for concluding that the plaintiffs had suffered legally compensable injury prior to the July 1, 1986 effective date. All of the plaintiffs were diagnosed in 1993 or 1994. Given the testimony of two medical experts, that mesothelioma typically exists ten years prior to diagnosis, we concluded that there was a factual basis to support a finding that the plaintiffs' injuries occurred prior to the July 1, 1986 effective date of the statute.[12] *Id.* at 165, 692 A.2d 5.

Ford does not argue that *Grimshaw* is distinguishable. Rather, Ford urges us to overrule *Grimshaw.* Ford contends that, although the *Grimshaw* analysis "may be easy to apply in 1992 or 1997, ... this Court's use of statistics and rough mathematics invites disaster in the near future." Ford then gives the example of the individual who is diagnosed on July 1, 1996. We disagree that Ford's hypothetical invites disaster. Under *Grimshaw,* we will uphold a trial court's determination of when an injury arises as long as that determination is supported by legally sufficient evidence. *See id.*

Mr. Grewe was diagnosed with mesothelioma in January, 1993. Further, there was expert testimony that his cancer likely began to develop at least ten years prior to the date of

---

12. We so concluded even though another expert testified that the cancer began, at the earliest, three years prior to diagnosis. In the instant case, there was no such contrary evidence.

 

diagnosis. Accordingly, there was a sufficient factual basis to support a finding that Mr. Grewe's injury occurred prior to the July 1, 1986 effective date of the statute.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; COSTS TO BE PAID BY APPELLANT.**